# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

No. 24-9000

_____

JOHN KOEHLER,

Petitioner/Appellant,

v.

LAUREL HARRY, Secretary,
Pennsylvania Department of Corrections, et al.,

Respondents/Appellees.

_____

On Appeal from the Order of the
United States District Court for the Middle District of Pennsylvania,
entered May 14, 2015, No. 3:12-cv-00291 (Capital Habeas Corpus)

_____

## APPELLANT'S APPLICATION
## FOR CERTIFICATE OF APPEALABILITY

### *** CAPITAL CASE ***

TRACY ULSTAD
Assistant Federal Defender
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Curtis Building, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

_Counsel for Appellant John Koehler_

## PRELIMINARY STATEMENT

Notes of testimony of the trial proceedings will be cited as "NTT," and include the date and time of the relevant testimony. Notes of testimony from the state post-conviction hearing will be cited as "NTP" and will also include the date and time. Exhibits introduced by Petitioner at the state postconviction hearing are cited as "PCRA Ex." followed by the number.

The Pennsylvania Supreme Court issued two opinions in this case: the first on direct appeal, *Commonwealth v. Koehler*, 737 A.2d 225 (Pa. 1999), and the second on appeal of Mr. Koehler's postconviction proceedings, *Commonwealth v. Koehler*, 36 A.3d 121 (Pa. 2012). These opinions will be cited as *Koehler-1* and *Koehler-2*, respectively. The District Court issued a memorandum opinion regarding its denial of the habeas petition. *Koehler v. Wetzel*, No. 3:12-CV-00291, 2015 WL 2344932 (M.D. Pa. May 14, 2015). That opinion will be cited as "DCO."

All emphasis in this application is supplied unless otherwise indicated.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF THE ISSUES ............................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE................................................................5

   I.   Procedural History .......................................................................5

   II.  Relevant Facts ..............................................................................7

      A. Pretrial and Trial Proceedings...............................................7

      B. Schrader's Criminal Proceedings.........................................13

      C. PCRA Proceedings ...............................................................16

STANDARDS FOR GRANTING A CERTIFICATE OF APPEALABILITY .......18

ARGUMENT ..........................................................................................19

   I.   REASONABLE JURISTS WOULD DEBATE WHETHER THE COMMONWEALTH VIOLATED DUE PROCESS BY SUPPRESSING FAVORABLE EVIDENCE AND PRESENTING FALSE AND MISLEADING TESTIMONY................................................19

      A. Reasonable Jurists Would Debate Whether the Commonwealth Violated Mr. Koehler's Due Process Rights by Suppressing Evidence of the Non-Prosecution Agreement. ...................20

         1.   The Commonwealth Violated *Brady*. .........................23

         2.   The Commonwealth Violated *Napue*...........................30

      B. Reasonable Jurists Would Debate The State And District Court Conclusions. ............................................................................33

         1.   The State Court Decision Was An Unreasonable Determination of the Facts...........................................34

         2.   The State Court Opinion Was Contrary To and An Unreasonable Application of Federal Law. .................36

         3.   The District Court Erred. ..............................................39

   II.  REASONABLE JURISTS WOULD DEBATE WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD CONVICT MR. KOEHLER OF FIRST DEGREE MURDER WITHOUT FINDING THAT HE HAD THE SPECIFIC INTENT TO KILL AND THAT THEY COULD INFER SPECIFIC

INTENT FROM THE ACTIONS OF AN ACCOMPLICE OR CO-CONSPIRATOR; AND REASONABLE JURISTS WOULD DEBATE WHETHER COUNSEL WAS INEFFECTIVE IN FAILING TO CLEARLY OBJECT TO THE COURT'S ERRONEOUS INSTRUCTIONS..................................................................40

    A. Background..........................................................................41

        1.   Relevant Facts............................................................41

        2.   Applicable Law ..........................................................45

    B. The Trial Court's Instructions Were Erroneous, and Counsel Was Ineffective in Failing to Clearly Object. ...............................51

        1.   The Trial Court Erroneously Instructed the Jurors that They Could Convict Mr. Koehler of First Degree Murder Without Finding He Had the Specific Intent to Kill. .................................51

        2.   Counsel Ineffectively Objected to the Erroneous Instructions.................................................................56

    C. Reasonable Jurists Would Debate The State and District Courts' Conclusions that The Jury Charge Was Correct and Clear When Read in Its Entirety.................................................................59

III.  REASONABLE JURISTS CAN DEBATE WHETHER MR. KOEHLER WAS PREJUDICED BY TRIAL COUNSEL'S COMPLETE FAILURE TO INVESTIGATE AND PREPARE FOR THE PENALTY PHASE. ........................................................65

    A. Counsel Was Deficient in Failing to Investigate and Present Mitigating Evidence, and Mr. Koehler Was Prejudiced By Counsel's Failures. ...............................................................66

    B. Reasonable Jurists Could Disagree With The State and District Courts' Conclusions That Mr. Koehler Was Not Prejudiced By His Counsel's Decision To Prepare No Penalty Phase Evidence........72

IV.  REASONABLE JURISTS COULD DEBATE WHETHER PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE OF THE CUMULATIVE PREJUDICE OF THE ERRORS DESCRIBED ABOVE. ......................................................................79

CONCLUSION .........................................................................82

## STATEMENT OF JURISDICTION

This is an appeal from the District Court's order denying habeas relief as to a state conviction and death sentence. Upon granting a certificate of appealability (COA), this Court will have jurisdiction over Mr. Koehler's appeal pursuant to 28 U.S.C. §§ 1291 and 2253(c).

## STATEMENT OF THE ISSUES

This Court should grant a COA under 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) because the following claims for relief are debatable among jurists of reason:

1) Whether the Commonwealth suppressed exculpatory and impeaching evidence and presented false and misleading testimony in violation of due process?

2) Whether Petitioner was denied his rights to due process and the effective assistance of counsel where the trial court erroneously instructed the jury in a manner that removed the Commonwealth's burden to prove the specific intent to kill required for first degree murder, and defense counsel failed to clearly object?

3) Whether Petitioner was prejudiced by trial counsel's complete failure to investigate and prepare for the penalty phase?

4) Whether Petitioner is entitled to relief from his conviction and sentence because of the cumulative prejudice of these errors?

## INTRODUCTION

Mr. Koehler was convicted of first-degree murder and sentenced to death for the murders of Regina Clark and her son, Austin Hopper. His co-defendant,

William Curley, admitted shooting both victims and concealing their bodies. Curley further admitted that he did this on his own, though he claimed Mr. Koehler compelled him to do it. Curley received a life sentence following his testimony in Mr. Koehler's trial.

The victims were killed at the home of Kirk Schrader, Curley's close friend. Schrader was the only eyewitness to the crime aside from Curley. After initially lying to police about the murders, Schrader admitted he was present and assisted in the murders. He claimed, consistent with his friend Curley, that Mr. Koehler coerced him into participating in the murders. Mr. Koehler was at Schrader's home at the time of the murders, but he claimed he was asleep after having worked overnight and was not aware of the murders when they happened.

The key issues the jury had to resolve were whether Koehler was involved in the murders and whether he intended for the victims to die. The prosecution presented several witnesses who testified about Mr. Koehler's relationships with the victims and Curley, but the only witnesses who were present at the scene and claimed to know how the murders occurred were Curley and Schrader. As the defense made clear in opening, on cross, and in closing argument, the credibility of these two men was key to the case. Specifically, defense counsel urged the jury to critically evaluate Curley's and Schrader's incentives to blame the murders on a third party in order to protect themselves.

The prosecution entered an enforceable non-prosecution agreement with Schrader before trial. After defense counsel's opening statement, in which counsel pointed to the agreement as evidence of Schrader's motivations and lack of credibility, the prosecution denied that the agreement existed and elicited testimony from both Schrader and the former prosecutor who entered into the agreement that there were no promises or agreements made in exchange for Schrader's testimony. Schrader testified to a version of events that was both highly self-incriminating and extremely damaging to Mr. Koehler's defense. After trial, Schrader filed a motion to enforce the non-prosecution agreement and dismiss the charges brought against him for his role in the murder. The trial court enforced the agreement and dismissed the charges, and Schrader walked free.

The state courts and District Court denied Mr. Koehler's due process claims on the theory that because the prosecution disavowed the agreement at the time of trial, Schrader "had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth." The courts credited the Commonwealth's absurd argument that, although the agreement was entered into before trial and enforced after trial, the "non-prosecution agreement did not exist at the time" of trial itself.

The state courts and District Court erred in permitting the prosecution to make an end run around Mr. Koehler's constitutional rights. Due process is not

satisfied where the prosecution can justify the suppression of evidence and presentation of false testimony with a dubious cover story. Instead, due process asks how effective counsel could have utilized the suppressed evidence. Here, defense counsel could have used the non-prosecution agreement—as counsel forecast in opening statement—to attack the integrity of a star witness, expose the witness's lies, and demonstrate that the witness was motivated to protect himself at the expense of Mr. Koehler.

But it doesn't end there. Counsel could have also demonstrated that the initial prosecutor on the case lied on the stand, and exposed the trial prosecutor as the engineer of the falsehoods. Altogether, this evidence would have permitted the defense to attack "the thoroughness and even the good faith" of the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 445 (1995).

Mr. Koehler's defense that he was present but unaware of the murders was further undermined by the trial court's erroneous jury instructions on specific intent. Rather than holding the Commonwealth to its burden of proof on every element of first degree murder, the trial court instructed the jurors that they could convict Mr. Koehler of first degree murder as an accomplice or co-conspirator. In doing so, the court effectively removed the Commonwealth's burden, not requiring a finding of specific intent to kill and achieving a conviction based solely on the

conduct of the admitted killer in this case, William Curley. Defense counsel failed to clearly object to these instructions and seek curative instructions.

Both the Pennsylvania Supreme Court and the District Court found that Mr. Koehler's defense counsel performed deficiently during the penalty phase of his trial—but neither court found Mr. Koehler was prejudiced by defense counsel's complete failure to investigate or prepare any penalty phase defense. The courts reached this conclusion by unreasonably discounting the mitigation evidence presented in postconviction proceedings and dismissing the evidence as necessarily weaker than the aggravators proffered by the Commonwealth.

While each constitutional violation in this case requires relief individually, the cumulative prejudicial effect of the multiple violations requires relief as well. A COA is warranted to determine whether the suppressed evidence, flawed intent instruction, and ineffective assistance of penalty phase counsel violated Mr. Koehler's constitutional rights.

## STATEMENT OF THE CASE

### I.    Procedural History

Mr. Koehler was sentenced to death in 1996 in the Court of Common Pleas, Bradford County, No. 95-CR-000309. His convictions and sentences were affirmed on direct appeal, *Commonwealth v. Koehler*, 737 A.2d 225 (Pa. 1999)

("*Koehler-1*"), and the United States Supreme Court denied certiorari, *Koehler v. Pennsylvania*, 531 U.S. 829 (Oct. 2, 2000).

On September 6, 2001, Mr. Koehler filed a petition under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §§ 9541-9546. Following an evidentiary hearing held on three separate days in 2006 and 2007, the PCRA court denied relief on June 30, 2009. *Commonwealth v. Koehler*, CP-08-CR-000309-1995 (Bradford Ct. Com. Pl. Jun. 30, 2009). Mr. Koehler timely appealed to the Pennsylvania Supreme Court, which affirmed the denial of the PCRA petition on January 20, 2012. *Commonwealth v. Koehler*, 36 A.3d 12 (Pa. 2012) ("*Koehler-2*"). Mr. Koehler did not seek certiorari in the United States Supreme Court.

On February 13, 2012, Mr. Koehler filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania. On May 14, 2015, the court issued an opinion and order dismissing all of Mr. Koehler's claims and denying a certificate of appealability. *Koehler v. Wetzel, et al.*, 2015 WL 2344932 (M.D. Pa. May 14, 2015). Mr. Koehler subsequently filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59.

On December 7, 2015, Mr. Koehler filed a successor PCRA petition based on the receipt of newly discovered evidence calling into question the impartiality of former Pennsylvania Supreme Court Justice Eakin. Shortly thereafter, Mr.

Koehler filed an unopposed motion for a stay and abeyance of federal proceedings pending state court review of the successor PCRA petition. *See Rhines v. Weber*, 544 U.S. 269 (2005); *Crews v. Horn*, 360 F.3d 146 (3d Cir. 2004). The District Court granted this motion on March 8, 2016.

After Mr. Koehler filed a status report indicating that his state court litigation was complete, the District Court lifted the stay of Mr. Koehler's federal habeas corpus proceedings. With permission from the court, Mr. Koehler filed a supplement to his Rule 59 motion on January 3, 2024, and the Commonwealth responded in opposition. The court denied Mr. Koehler's Rule 59 motion on April 1, 2024, and declined to issue a certificate of appealability. Mr. Koehler timely appealed.

## II.    Relevant Facts

### A. Pretrial and Trial Proceedings

Mr. Koehler was convicted and sentenced to death based primarily on the testimony of Kirk Schrader and William Curley, two close friends who were the only eyewitnesses to the crime and who both admitted their own involvement in the murders. The Commonwealth alleged that Mr. Koehler orchestrated the murders and pressured Curley and Schrader into killing the victims. The prosecution relied primarily on the friends' testimony in support of this theory because little other evidence suggested Mr. Koehler was responsible for the

7

murders; Mr. Koehler maintained his innocence, and no physical evidence indicated that Mr. Koehler committed the murders.

Schrader was a problematic witness from the earliest moments in this case. When initially questioned, Schrader lied to the police and claimed he was not present when the murders took place. NTT 4/3/96 AM at 110. After Schrader's initial false statements, police learned from Curley that Schrader had given him permission to kill Regina Clark in his garage. *See* PCRA Ex. 2, *Commonwealth v. Schrader*, No. 96 C000286, Opinion (J. Smith) ("Schrader Slip Op.") at 2-3. The police then reinterviewed Schrader. *Id.*

The District Attorney at the time, Robert Fleury, was present at the second interview and promised Schrader that he would not be prosecuted if he cooperated. Schrader's attorney, W. Marshall Dawsey, was also present and, before allowing his client to make an inculpatory statement, received Fleury's assurance that Schrader would not be prosecuted. PCRA Ex. 3, *Commonwealth v. Schrader*, No. 96 CR000286; NMT 11/22/96 at 66-67 (testimony from Schrader motion to dismiss).

After receiving this guarantee, Schrader admitted that he lied to police and had taken affirmative steps in support of the homicides. This included watching Curley shoot Clark; retrieving the bullets Curley would use to kill Clark's ten-year-old son, Austin; watching Curley load his weapon with those bullets; and leaving

the scene of the murders with Curley in a vehicle carrying Clark's body. NTT 4/3/96 AM at 95-98, 100.

Schrader went on to testify at a preliminary hearing and later at Mr. Koehler's trial. At the time of his trial testimony, he faced no charges for his role in the murders. Schrader reinforced Curley's trial testimony by claiming that, although Curley committed the murders, Mr. Koehler directed the action and even demanded Schrader assist in the murders. *Id.* at 91-94. Schrader also claimed Mr. Koehler made disrespectful comments about the adult victim after Curley killed her. *Id.* at 99.

Curley admitted at trial that he killed both victims in Schrader's garage and that Mr. Koehler was not in the room when the victims were killed. NTT 3/28/96 PM at 62-63. He also testified that he carried Clark's body away from the garage, slashed at Clark's throat after he got her out of the trunk, and placed her body in an abandoned refrigerator. NTT 3/28/96 AM at 101-02. He also admitted to hiding Austin's body on his own. *Id.* at 107-08. He testified that he killed the victims and then concealed the bodies at Mr. Koehler's direction, claiming he feared for his life and the life of his family, because John told him he was a "hit man" with connections to organized crime and the government. *Id.* at 125. Although Curley undisputedly murdered the victims in a highly aggravated manner, he received a

life sentence. *Commonwealth v. Curley*, No. CP-08-CR-0000308-1995 (Bradford County CCP, May 24, 1996).

Defense counsel attempted to limit the damage done by Curley and Schrader by attacking their credibility. Although Mr. Koehler was present at the house where the victims were murdered, he was asleep and not aware that the murders had taken place. NTT 3/25/96 AM at 60-61. In opening statements, defense counsel pointed out that Curley was facing a possible death sentence and that he was testifying to protect himself. *Id.* at 42. Defense counsel also contended that the jury should not believe Schrader because he made inconsistent statements to police, initially claiming that he did not know anything about the murder *Id.* at 43-44. Defense counsel explained that "when [Schrader] finally implicates my client, it's after he's got an attorney, and about that time the District Attorney comes up to him and says we're giving you immunity. We won't prosecute you." *Id.*

District Attorney Robert McGuinness[1] objected during the opening statement and claimed at a sidebar that defense counsel was "going to have to show [him] an immunity order." NTT 3/25/96 AM at 52, 55. Later, before Schrader testified, defense counsel explained at another sidebar that it was his "understanding that . . . Schrader has not been given immunity" and might

---

[1] McGuinness had assumed the role of district attorney by the time of Mr. Koehler's trial.

incriminate himself with his testimony. NTT 4/3/96 AM at 67. McGuinness

confirmed defense counsel's understanding and explained that he had "personally

communicated" to Schrader that his testimony could be "used against him." NTT

4/3/96 AM at 67-69. McGuinness also told the court that he had "communicated in

the past" to Dawsey, Schrader's lawyer, that "the information [Schrader] testifies

to can be used against him." *Id.*

    The trial court questioned Schrader, who said he had consulted with

Dawsey, that Dawsey was aware his testimony implicated him in the offense, and

that Dawsey "consulted [him] and advised [him] about whether [he] should

testify." *Id*. at 70. Dawsey authorized Schrader's testimony but did not attend Mr.

Koehler's trial when his client took the stand. *Id*. at 69.

    Following the sidebar, the prosecution elicited testimony from Schrader that

he "did not have some sort of immunity," had not received "any favors," and that

no one made him "any promises" in exchange for his testimony. *Id.* at 109.

McGuinness also called Fleury, the former DA, to testify that he had never

"mention[ed] the concept of immunity" or otherwise "promise[d] [Schrader]

anything with respect to his testifying whatsoever." NTT 4/4/96 AM at 69-72.

    The Commonwealth elicited this testimony specifically to rebut defense

counsel's attack on Schrader's credibility, reminding the jury in closing that they

heard about a "grant of immunity" in the opening statement but there was in fact no deal:

> In opening statement, you heard Kirk Schrader is not to be believed, he's testifying under a grant of immunity. What grant of immunity? Did Bob Fleury give him one? Was a court order produced to show that he got a grant of immunity? What did he tell you? The testimony he's given right there can be used against him.

NTT 4/10/96 PM at 20-21.

The prosecution urged the jury to find Mr. Koehler "directed the execution of Regina Clark and her nine year old son." *Id.* at 20-21; *see id.* at 31-32 (prosecution claiming in closing argument that Mr. Koehler directed Curley to commit the murders and arguing the jury could find Mr. Koehler guilty as an accomplice or co-conspirator). The prosecution also argued the jury could rely on Schrader's testimony to support proof "beyond a reasonable doubt" of Mr. Koehler's guilt. *Id*. at 33.

In closing, the defense encouraged the jury to reject Curley and Schrader's attempts to blame the murders on Mr. Koehler as efforts to save themselves. NTT 4/10/96 AM at 46, 53, 60-64, 71-72. But the defense abandoned the attack it had levied in its opening statement that Schrader incriminated Mr. Koehler only after being promised immunity. Instead, the defense highlighted Schrader's involvement in the murder and argued the jury could find "[m]aybe three people were involved in the homicide or maybe two and only two and maybe those two were Mr.

Schrader and Mr. Curley." *Id.* at 62-63. Following these arguments, Mr. Koehler was convicted of all charges against him.

### B. Schrader's Criminal Proceedings

Following Mr. Koehler's conviction and death sentence, evidence established that Schrader had entered into an enforceable non-prosecution agreement with the Commonwealth, despite the prosecution's contrary claims and evidence presented at Mr. Koehler's trial. As discussed above, the Commonwealth told the trial court and Mr. Koehler's attorney that there was no non-prosecution agreement, and elicited false testimony from both Schrader and Fleury claiming no promises were made in exchange for Schrader's testimony.

The evidence that emerged after Mr. Koehler's trial eliminated any doubt that an agreement was reached and was enforceable. A month after Mr. Koehler's trial concluded, Schrader was arrested and charged with hindering apprehension, aiding and abetting, and criminal conspiracy for his role in the murders. *Koehler-2*, 36 A.3d at 137. Schrader then filed a motion to dismiss the charges because he had entered a non-prosecution agreement with the prosecution before giving an inculpatory statement, and had fulfilled the terms of the agreement by testifying. *Id.* Alternatively, Schrader asked that the trial court suppress his inculpatory statements. The Commonwealth, represented by McGuinness, responded that (1) there was no agreement because the Commonwealth had not intended to prosecute

13

Schrader; and (2) even if there had been an agreement, Schrader breached it by lying at the preliminary hearing. PCRA Ex. 2, Schrader Slip Op. at 2-3.

Schrader had a contested hearing on his motion in front of Judge Smith, the same judge who presided over Mr. Koehler's trial and later PCRA proceedings. Fleury, State Trooper Madigan, and Dawsey, Schrader's attorney, all testified at the hearing. Fleury claimed there was never an agreement and Schrader was merely told he was not a suspect in the murder, alleging he "never used those words of immunity" and it "never came up about prosecution." PCRA Ex. 9, *Commonwealth v. Schrader*, No. 96 CR000286; NMT 11/22/96 at 11. Madigan admitted that he recorded a meeting in a May 1995 police report, in which "District Attorney Fleury told Schrader that he was being interviewed as a witness in this case, not as a suspect, and informed him that prosecution would not be sought against him." *Id*. at 44. When asked about this report on cross, Madigan claimed that he recalled Fleury telling Schrader he was not a suspect but that the "sentence regarding prosecution may have been an inference on [his] part." *Id*.

Dawsey testified that he was present at the interview, that Fleury had assured him Schrader would not be prosecuted, and that Dawsey only allowed his client to speak with police after receiving that assurance. *Id*. at 66-67. Dawsey also introduced the report written by Madigan that documented the meeting, including

that Fleury and Dawsey were present, and indicated that Schrader was told he would not be prosecuted. *See* PCRA Ex. 2, Schrader Slip Op. at 6-7.

On cross-examination, Dawsey testified that he did not "commit this agreement to writing" because he did not "think it was necessary." PCRA Ex. 9, *Commonwealth v. Schrader*, No. 96 CR000286; NMT 11/22/96 at 72. He denied that he and Fleury "misunderstood each other" about the agreement, explaining that it was "not a possibility at all, when a District Attorney is talking to another lawyer about something this important." *Id*. Dawsey also explained that after they reached the agreement, he allowed Schrader to testify at the preliminary hearing, be interviewed again by the DA, and to testify at trial. *Id*. at 67. Dawsey did not attend the future interviews, the hearing, or the trial. *Id*.

At trial, Judge Smith, found that the Commonwealth had reached a non-prosecution agreement with Schrader, and that Schrader's various claims about the murders in his police statement, preliminary hearing testimony, and trial testimony were consistent. PCRA Ex. 2, Schrader Slip Op.  at 7-8, 16. In reaching this conclusion, Judge Smith found that Dawsey was "more credible" than Fleury, Dawsey's claims about the agreement were corroborated by Madigan's report, and Fleury's testimony was contradicted by the report. *Id*. The trial court also relied on his past experiences with Dawsey and certain situational inferences to reinforce his credibility finding. *Id*.

In accord with Judge Smith's findings, the charges against Schrader were dismissed pursuant to the non-prosecution agreement. The trial court acknowledged that it could have stopped at suppressing Schrader's inculpatory statements but declined to do so, finding that Schrader had "paid his consideration" by testifying. PCRA Ex. 2, Schrader Slip Op. at 20. The Commonwealth did not appeal the trial court's decision.

### C. PCRA Proceedings

During his PCRA proceedings, again held before Judge Smith, Mr. Koehler relied on the court's conclusion that Schrader did in fact have a non-prosecution agreement to show the prosecution violated Mr. Koehler's due process rights by failing to disclose the deal before trial. The record from Schrader's criminal matter, including the testimony from his motion to dismiss, was incorporated into the PCRA record. NTP 5/31/06 PM at 34.

Mr. Koehler's trial attorney, Leonard Frawley, testified at the PCRA proceedings that he had specifically requested evidence of any deals reached with Schrader. *Id.* at 26-27. He further testified that the Commonwealth had responded that there was no agreement. *Id*. at 30, 32. Frawley made clear that had he known about the non-prosecution agreement, he would have taken advantage of it to attack Schrader's credibility. As he explained in his PCRA testimony, "Mr. Schrader was an important witness, it would have been evidence that was

16

significantly relevant to his credibility." *Id.* at 36. Frawley added that "[i]f I hear this, no matter what Schrader says, if I hear there's this agreement . . . I'm going to jump all over it." *Id*. at 95.

In response, the Commonwealth introduced the testimony of McGuinness, who claimed he "told Mister Schrader that he had no deal from the Commonwealth, we were not offering him any deal, that he could testify as the Commonwealth's witness, or he could choose not to." NTP 6/1/06 at 121-22; *Koehler-2*, 36 A.3d at 137. McGuinness also claimed that he "had discussed the matter, thoroughly, with Mister Fleury and with Trooper Madigan and they both assured me that they had not entered into any sort of agreement with" Schrader. NTP 6/1/06 at 122.

The PCRA court determined that McGuinness's PCRA testimony, coupled with Schrader's trial testimony, was evidence that "Schrader believed that his testimony at [Mr. Koehler]'s trial could subsequently be used against him, and, therefore, had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth." *Koehler-2*, 36 A.3d at 138.

Although Schrader did not testify at the PCRA proceedings regarding his beliefs or expectations, and Mr. Koehler's PCRA counsel repeatedly objected to any speculation about Schrader's beliefs, NTP 5/31/06 PM at 88, 89, 91-93, 98,

NTP 6/1/06 at 106-08, 110-12, the Pennsylvania Supreme Court affirmed the

PCRA court's finding on appeal. *Koehler-2*, 36 A.3d at 138.

## STANDARDS FOR GRANTING A CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253 and Rule 22(b) of the Federal Rules of Appellate

Procedure, as amended by the Anti-Terrorism and Effective Death Penalty Act of

1996 (AEDPA), a COA must be granted to a habeas petitioner for each claim

where there is "a substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c)(2).

In *Slack v. McDaniel*, 529 U.S. 473, 483 (2000), the Supreme Court ruled

that AEDPA's COA requirement is "a codification of" the pre-AEDPA standard

for granting a certificate of probable cause, as announced in *Barefoot v. Estelle*,

463 U.S. 880, 894 (1983). A petitioner is entitled to a COA if an issue is

"debatable among jurists of reason"; "a court could resolve the issue[] [in a

different manner]"; or "the question [is] adequate to deserve encouragement to

proceed further." *Id. at* 893 n.4 (internal quotation marks and citation omitted); *see

also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (applying same standard

under AEDPA). "Where a district court has rejected the constitutional claims on

the merits, the showing required to satisfy § 2253(c) is straightforward: The

petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at

483.

A court need not be convinced of the ultimate merits before granting COA. "[W]hen a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims." *Miller-El*, 537 U.S. at 327; *see also Buck v. Davis*, 580 U.S. 100, 115 (2017) (stating the certificate of appealability inquiry is "not coextensive with a merits analysis"); *Pabon v. Mahanoy*, 654 F.3d 385, 398 (3d Cir. 2011) (alleged constitutional violation "need only be debatable" for granting a COA).

## ARGUMENT

## I.  REASONABLE JURISTS WOULD DEBATE WHETHER THE COMMONWEALTH VIOLATED DUE PROCESS BY SUPPRESSING FAVORABLE EVIDENCE AND PRESENTING FALSE AND MISLEADING TESTIMONY.

John Koehler was denied access to critical evidence that key witness Kirk Schrader, an admitted participant in the offense, testified based on an agreement with the Commonwealth that he would not be prosecuted for his role in the murders. Both Schrader and the former district attorney lied at trial about the existence of the non-prosecution agreement. Reasonable jurists would debate whether the Commonwealth's suppression and failure to correct false testimony violated Mr. Koehler's due process rights. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S.

19

264 (1959); *see also Wearry v. Cain*, 577 U.S. 385, 393–94 (2016); *Banks v. Dretke*, 540 U.S. 668, 690 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985).

This Court should grant a COA to review and ultimately grant relief on this claim.

### A. Reasonable Jurists Would Debate Whether the Commonwealth Violated Mr. Koehler's Due Process Rights by Suppressing Evidence of the Non-Prosecution Agreement.

Reasonable jurists would debate whether the suppression of the non-prosecution agreement violated due process. The few, simple facts that establish a constitutional violation are the following: Schrader was personally involved in the murders and, based on his own testimony, could have been convicted of multiple felony offenses and subject to a sentence of death; the prosecution shielded him from all criminal liability in exchange for his testimony at Mr. Koehler's trial; the prosecution told the jury that no deal existed; Schrader and the former district attorney both falsely testified that no one had made any promises in exchange for his testimony; and Schrader later successfully shielded himself from prosecution based on the trial judge's finding that Schrader did indeed have a non-prosecution agreement with the prosecution.

The Due Process Clause requires the prosecution to disclose favorable evidence that is material to the defense. *Brady*, 373 U.S. at 87; *accord Banks*, 540

U.S. at 690; *Kyles*, 514 U.S. at 437; *Bagley*, 473 U.S. at 676; *Giglio*, 405 U.S. at

153-56. The duty to enforce *Brady* "with painstaking care is never more exacting

than it is in a capital case." *Kyles*, 514 U.S. at 422.

A petitioner can establish a *Brady* violation by demonstrating that favorable

evidence was suppressed by the government, either intentionally or inadvertently,

and that the suppressed evidence was material. *Simmons v. Beard*, 581 F.3d 158,

167 (3d Cir. 2009). Evidence that is not disclosed by the prosecution is suppressed,

regardless of whether it was requested by the defense. *See Banks*, 540 U.S. at 696

("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable

in a system constitutionally bound to accord defendants due process."); *United

States v. Agurs*, 427 U.S. 97, 107 (1976) (holding duty to disclose *Brady* evidence

applies even if there has been no request by the accused).

Favorable evidence includes impeachment evidence. *Bagley*, 473 U.S. at

676; *see also Giglio*, 405 U.S. at 154 ("When the 'reliability of a given witness

may well be determinative of guilt or innocence,' nondisclosure of evidence

affecting credibility falls within this general rule."). A witness's hopes for

protection from criminal charges by the prosecution is powerful impeachment

evidence under *Brady*. *See Napue*, 360 U.S. at 270 (jury may have concluded

witness "fabricated testimony in order to curry the favor of the very representative

of the State" who was in position to provide witness with favorable treatment);

*Wearry*, 577 U.S. at 394 (due process violation where prosecution suppressed evidence that witness was seeking "possibility of a reduced sentence on an existing conviction" in exchange for testimony); *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017) (reasonable likelihood that jury assessment of witness would be affected by suppressed evidence that witness hoped for "substantial help with her own pending criminal charges").

Evidence is "material" under *Brady* when "[t]he favorable evidence could reasonably be taken" to put the case "in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also id*. at 434 ("A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'") (quoting *Bagley*, 473 U.S. at 678). This threshold is met when, *inter alia*, suppressed impeachment evidence would have "undercut the credibility of a key prosecution witness in a manner not duplicated by other challenges." *Dennis v. Sec'y, Pennsylvania Dep't of Corr*., 834 F.3d 263, 298 (3d Cir. 2016) (en banc).

Due process is also violated "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269; *see also Kyles*, 514 U.S. at 433 (due process is violated "where previously undisclosed evidence revealed that the prosecution introduced trial testimony that it knew or should have known was perjured"). The individual prosecutor does not need to

subjectively know that the government's evidence is false or misleading to violate due process. *See Giglio*, 405 U.S. at 154 (due process violated by witness's false denial of a promise of immunity, where falsity was unknown to trial prosecutor but known to another prosecutor in the office). It is enough to show the prosecution "knowingly, recklessly or negligently used the false testimony." *Agurs*, 427 U.S. at 103.

The principle that the state may not rely on false evidence applies equally where such evidence goes only to the credibility of a witness, given that "it is upon such subtle factors . . . that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269. Under *Napue*'s more defense-friendly materiality standard, relief is warranted if there is "any reasonable likelihood" that the false testimony would have "affected the judgment of the jury." *Id*. at 271; *accord Giglio*, 405 U.S. at 154. Here, it is at the very least debatable whether *Brady* and *Napue* were violated.

### 1.  The Commonwealth Violated *Brady*.

*The Non-Prosecution Agreement Was Suppressed*

The prosecution's suppression was remarkable in its flagrant disregard for both the law and reality. The non-prosecution agreement was reached in May 1995. It was enforced after trial, following an October 1996 hearing, when the trial court "concluded that there was a non-prosecution agreement reached between the Commonwealth and Defendant" and dismissed Schrader's criminal charges.

23

Despite the undisputed fact that it existed before and after Mr. Koehler's trial, the Commonwealth claims that the agreement temporarily disappeared from existence at the precise time when the Commonwealth was under a duty to disclose.

Not only did the Commonwealth shirk its duty, it went out of its way to hide the ball, eliciting false testimony from Schrader that he had not "been made any promises" or received "any favors" for his testimony and false testimony from the prior district attorney that Schrader was never promised anything in exchange for his testimony. NTT 4/3/96 AM at 67-69; *id.* at 109; NTT 4/4/96 AM at 69-72. Accordingly, the evidence was suppressed. *See Banks*, 540 U.S. at 696; *Agurs*, 427 U.S. at 107.

*The Non-Prosecution Agreement Was Favorable*

A non-prosecution agreement to secure the testimony of a cooperating accomplice is a textbook example of favorable evidence. An accomplice witness who is testifying in exchange for the expectation of favorable treatment on their own charges is at the mercy of the prosecution, and a jury might conclude that this dynamic "strengthens [the witness's] motive to testify favorably for the Commonwealth." *Commonwealth v. Strong*, 761 A.2d 1167, 1175 (2000); *Napue*, 360 U.S. at 270.

Here, the Commonwealth's case relied heavily on the credibility of Schrader and Curley, who corroborated the Commonwealth's theory that Mr. Koehler

orchestrated the murders. The suppressed agreement was favorable to Mr. Koehler because it undermined the credibility of Schrader, and of the prosecution as a whole, in several critical ways, including by demonstrating that Schrader had a powerful incentive to cooperate with the prosecution, and by establishing that both Schrader and Fleury lied on the stand when they claimed that Schrader had never been promised anything in exchange for his testimony.

*The Non-Prosecution Agreement Was Material*

As this Court has long recognized, when the prosecution's case turns on the credibility of its witnesses, impeachment evidence impacting those witnesses is material. *See United States v. Pelullo*, 105 F.3d 117, 123 (3d Cir. 1997); *United States v. Biberfeld*, 957 F.2d 98, 103 (3d Cir. 1992); *Lambert v. Beard*, 537 F. App'x 78, 85-87 (3d Cir. 2013). The suppressed non-prosecution agreement in this case was material because: (1) it undermined critical aspects of, and a key witness for, the prosecution's case; (2) it impacted the defense's preparation for trial; (3) Schrader was also an accomplice in the crime and his non-prosecution agreement would call into question the reliability of the Commonwealth's investigation; and (4) it contributed to Mr. Koehler's death sentence.

*First*, the suppressed evidence was material because it undermined critical evidence, and the testimony of a key witness, in the Commonwealth's case. According to the Commonwealth's theory, Mr. Koehler "coaxed, directed, and

demanded that William Curley, and even Kirk Schrader, participate in this intentional killing." NTT 3/25/96 AM at 34. Schrader supported this theory with his testimony. Mr. Koehler admitted he was present at Schrader's home when the murders took place, but explained that he was sleeping. Schrader's credibility was one of the critical disputes at trial. Because the suppressed non-prosecution agreement "necessarily undermines" such a "central witness" it "would have had devastating effects on the prosecution's case at trial." *Dennis*, 834 F.3d at 301.

*Second*, the evidence was material because it "would have empowered defense counsel to pursue strategies and preparations he was otherwise unequipped to pursue." *Id*. at 308. Defense counsel recognized that Schrader was critical to the Commonwealth's case and repeatedly attacked his credibility at trial. In his opening statement, defense counsel contended that the jury should not believe Schrader because he made inconsistent statements about the murder, including initially denying that he was present when Curley killed the victims. NTT 3/25/96 AM at 43-44. Counsel explained that Schrader was only testifying against Mr. Koehler pursuant to an immunity deal with the Commonwealth. *Id*. at 44. At that point, the Commonwealth then directly undercut this key area of the defense by falsely representing to the trial court and defense counsel that there was no agreement, by presenting false testimony that there was not any deal, and by capitalizing on those falsities in closing argument. *See Kyles*, 514 U.S. at 444

26

("likely damage [from suppression] is best understood by taking the word of the prosecutor"). Had the agreement been disclosed, counsel could have pursued a more vigorous impeachment of Schrader by revealing his bias, and by arguing that the inconsistent statements he made to the Commonwealth were the product of negotiating his immunity agreement.

*Third*, the non-prosecution agreement was crucial for attacking both Schrader's credibility and the integrity of Koehler's capital prosecution because Schrader was an accomplice to the murders. Indeed, Schrader's involvement in the murders was more direct and substantial than Mr. Koehler's, even by the Commonwealth's own account. Yet, despite his potential capital liability, Schrader was not facing any criminal charges at the time of trial, and he walked away from the murders scot-free. Had the non-prosecution agreement been disclosed, the defense could have used it to show Schrader's bias and effort to shift blame onto Koehler and to demonstrate that the prosecution failed to fully investigate his role in the crime. *See Kyles*, 514 U.S. at 447 (evidence material where police failure to treat witness "as a suspect" implicated "reliability of the investigation" and credibility of police); *Napue*, 360 U.S. at 270 (jury may have concluded witness sought to "curry the favor" of prosecution); *Lambert v. Beard*, 537 F. App'x 78, 86 (3d Cir. 2013) (suppressed evidence material where it "bolster[ed] [defense]

argument that [witness] had invented a third perpetrator in order to minimize his own level of involvement in the crime").

*Fourth*, the suppressed evidence undermined "the reliability of the jury's verdict regarding punishment." *Banks*, 540 U.S. at 703; *Brady*, 373 U.S. at 87. In *Banks*, the Supreme Court found that suppressed evidence that a key witness was a paid informant was material to the defendant's punishment. 540 U.S. at 703. There, the witness was critical to establishing that the defendant posed a risk of future violence, a necessary finding the jury was required to make before Banks was found death eligible. *Id*. at 681-82. The suppressed evidence went to the witness's credibility, with the Supreme Court observing in part that the jury "might well have distrusted" the witness given his "continuing interest in obtaining" law enforcement favor. *Id*. at 701-02.

The evidence in this case parallels the evidence that the *Banks* Court found material to the death sentence. Here, the Commonwealth relied exclusively on the facts of the offense in arguing for a death sentence. Because no one disputed that Curley killed both victims, the prosecution relied on its theory that Mr. Koehler forced Curley to commit both murders to argue in favor of statutory aggravation. Schrader's trial testimony was important to this theory. Here, as was the case in *Banks*, evidence that challenged the credibility of a key witness and demonstrated that he had an incentive to satisfy the prosecution and protect himself from

prosecution, undermined "the reliability of the jury's verdict regarding punishment." *Id.* at 703. Indeed, the suppression of the agreement here prevented the defense from arguing that a death sentence was entirely inappropriate for Mr. Koehler given that Schrader received complete immunity despite his more direct role in the murders.

The suppressed evidence here is also similar to evidence the Supreme Court found material in *Brady v. Maryland*. In that case, the defendant "admitted his participation in the crime" but claimed that his co-defendant "did the actual killing." 540 U.S. at 84. The defendant relied on his mitigated role in asking the jury to return a life sentence. *Id.* The prosecution suppressed evidence that Brady's co-defendant confessed to killing the victim and Brady was sentenced to death. The Supreme Court found that the suppressed confession was material to the defendant's punishment, even though the confession suggested Brady may have intended the victim's death. *Id*. at 88.

Here, as in *Brady*, Mr. Koehler urged the jury to rely on his mitigated role in the offense in support of a life sentence, arguing that the jury could find his lesser role to be statutory mitigation. The Commonwealth argued the jury should reject this mitigation based on the theory that Mr. Koehler forced Curley to kill the victims, a theory that was rooted in Curley and Schrader's trial testimony. NTT 4/12/96 at 29. Accordingly, evidence that undermined Schrader's testimony

impacted the jury's assessment of the appropriate punishment. As the Supreme

Court explained in *Brady*, it "would be 'too dogmatic' for us to say that the jury

would not have attached any significance to this evidence in considering the

punishment." 540 U.S. at 88 (citation omitted); *see also Cone v. Bell*, 556 U.S. 449,

474 (2009) (discussing "far lesser standard that a defendant must satisfy to qualify

evidence as mitigating in a penalty hearing in a capital case").

Taken altogether, reasonable jurists would at minimum debate whether the

suppression of the non-prosecution agreement was a *Brady* violation.

### 2.  The Commonwealth Violated *Napue*.

Reasonable jurists would also debate whether the prosecution violated Mr.

Koehler's due process rights by introducing false testimony that the non-

prosecution agreement did not exist.

Courts routinely find due process violations where witnesses conceal the

incentive that induces them to testify. In *Napue*, the defendant was convicted of

murder based on the testimony of a co-defendant who admitted his own

participation in the underlying robbery. *Napue*, 360 U.S. at 265-66. On cross-

examination the witness "falsely testified that he had been promised no

consideration for his testimony." *Id*. at 267. In fact, the prosecution had told the

witness that they would potentially assist him with a reduction of his sentence and

failed to correct his false testimony that he had not received any promises. *Id*. at

268. The Supreme Court reversed, finding the jury's assessment of the witness's credibility may have been impacted by his hope for a better sentence, and that the "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Id*. at 269; *see Giglio*, 405 U.S. 150 (reversing conviction where accomplice witness falsely denied existence of deal with government); *Haskell*, 866 F.3d at 144, 146 (finding *Napue/Giglio* violation where witness falsely denied that she had "been promised anything by [the prosecution]").

Here, the Commonwealth elicited false testimony by Schrader that he did not receive any "promises" or "favors," NTT 4/3/96 AM at 109, and false testimony from Fleury, the former district attorney, that he never promised Schrader anything "with respect to his testifying whatsoever," NTT 4/4/96 AM at 72. The prosecution then relied on this testimony in closing argument to undermine Mr. Koehler's defense. NTT 4/10/96 PM at 21.

This testimony and argument were directly refuted by the Schrader court's subsequent determination "that there was a non-prosecution agreement reached between the Commonwealth and Defendant." PCRA Ex. 2, Schrader Slip Op. at 8. In reaching this conclusion, Judge Smith found that Dawsey, Schrader's attorney, was "more credible" than Fleury, that his testimony that the agreement existed was corroborated by contemporaneous police reports, and that Fleury's testimony was

31

contradicted by the report. *Id*. This finding demonstrates that both witnesses lied at Mr. Koehler's trial, and that the prosecution had an obligation to correct the false testimony. *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 154; *Haskell*, 866 F.3d at 147. Binding precedent thus demonstrates that Mr. Koehler has made a substantial showing of a denial of his due process rights.

Mr. Koehler was prejudiced by the false testimony and argument. "[T]he materiality standard for false testimony is lower, more favorable to the defendant, and more hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." *Haskell*, 866 F.3d at 152 (quotation omitted). Because the suppressed evidence already meets the higher *Brady* materiality standard, it easily clears the "more favorable" *Napue/Giglio* standard. As discussed above, Schrader was a central witness at trial. The defense's opening argument demonstrates that Schrader's incentive to protect himself was a key aspect of Mr. Koehler's defense, and the prosecution's introduction of false testimony and use of that testimony in closing argument further demonstrates that Schrader's credibility was a critical issue at trial. *See Haskell*, 866 F.3d at 152 ("[H]ow can a defendant possibly enjoy his right to a fair trial when the state is willing to present (or fails to correct) lies told by its own witness and then vouches for and relies on that witness's supposed honesty in its closing?"). The false testimony was also important to the jury's sentencing determination because, without evidence of the

agreement, the defense could not argue that a death sentence for Mr. Koehler was unfair where the prosecution had promised that a more culpable accomplice would suffer no punishment at all.

### B. Reasonable Jurists Would Debate The State And District Court Conclusions.

The PCRA court rejected Mr. Koehler's due process claims after finding that the agreement did not exist at the only time it mattered here: during Mr. Koehler's trial. This finding was facially unreasonable in light of the proof that Schrader's agreement was reached before trial and enforced after trial. The PCRA court also unreasonably found, without factual support, that at the time he testified at Mr. Koehler's trial, Schrader "believed there was [no] promise of leniency from the Commonwealth." *Koehler-2*, 36 A.3d at 138 (quoting PCRA court opinion). This finding was unreasonable where there was no PCRA testimony about Schrader's "belief." It was also unreasonable where Schrader, while represented by counsel, provided damning, self-incriminating trial testimony that would have exposed him to capital prosecution in the absence of an agreement. The Pennsylvania Supreme Court nonetheless affirmed the PCRA court's finding that Schrader had "no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth." *Koehler-2*, 36 A.3d at 138.

The District Court adopted the state court's conclusions and analysis on the *Brady* violation. DCO at *45, 48. The District Court also denied Mr. Koehler's

*Napue/Giglio* claim after concluding that there was "no evidence that Mr. Schrader committed perjury at Mr. Koehler's trial or that the Commonwealth knew or should have known of any alleged perjury." *Id*. at *48.

Reasonable jurists would debate whether the state court decision was both an unreasonable determination of the facts and contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C.A. § 2254(d)(1), (d)(2). Reasonable jurists would also debate the District Court's analysis of the *Giglio* violation.

### 1. The State Court Decision Was An Unreasonable Determination of the Facts.

The state court unreasonably concluded that there was not a non-prosecution agreement at the time of Mr. Koehler's trial. In the PCRA appeal, Pennsylvania Supreme Court Justice Saylor wrote a concurring opinion finding that there was an agreement, that the agreement should have been disclosed, and that the agreement would have "served to impeach Schrader's testimony that there was no favorable treatment." *Koehler-2*, 36 A.3d at 137 (Saylor, J., concurring). Justice Saylor's opinion itself establishes that a COA should be issued. *See Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) ("When a state appellate court is divided on the merits of the constitutional question, issuance of a certificate of appealability should ordinarily be routine.").

Moreover, the PCRA court itself was "divided on the merits" of the existence of the non-prosecution agreement. While considering the situation with respect to Schrader's motion to dismiss, Judge Smith concluded that the parties had entered into a non-prosecution agreement. PCRA Ex. 2, Schrader Slip Op. at 6-8. When evaluating the situation during Mr. Koehler's PCRA proceedings, Judge Smith contradictorily concluded that there was no "undisclosed agreement" because the agreement "clearly had been repudiated by the Commonwealth, whether lawfully or not, and Schrader himself acknowledged that he had no form of immunity." ECF 34-3 at *11-12 (Koehler PCRA Slip Op.). The PCRA court's inconsistent rulings demonstrate the debatability of the issue.

Additionally, the state court decision was an unreasonable determination of the facts because the law precluded the Commonwealth from unilaterally revoking the non-prosecution agreement, as it purported to do. *See Commonwealth v. Stipetich*, 652 A.2d 1294, 1295 (Pa. 1995) (citing cases recognizing valid and binding nature of non-prosecution agreements); *Commonwealth v. Cosby*, 252 A.3d 1092, 1134 (Pa. 2021) (when defendant relies on prosecutor's guarantee of non-prosecution "to the detriment of" a constitutional right, the "principle of fundamental fairness that undergirds due process of law in our criminal justice system demands that the promise be enforced"); *see also Lafler v. Cooper*, 566 U.S. 156, 174 (2012) (acknowledging contract principles applied to plea offer and

35

ordering State to reoffer plea as remedy for ineffective assistance of counsel that resulted in rejection of plea); *Santobello v. New York*, 404 U.S. 257, 262 (1971) (holding a plea bargain was enforceable against the government).

During Schrader's proceedings, the state court found that before Mr. Koehler's trial, Schrader was offered and accepted a non-prosecution agreement, and that the agreement was binding on the Commonwealth. *Koehler-2*, 36 A.3d at 137. This finding means that the agreement was in effect at the time Schrader testified at Mr. Koehler's trial and, consistent with state law, could not be withdrawn then or thereafter. The prosecutor's "repudiation" was nothing but hot air. It was an unreasonable determination of the facts for the state court to ascribe legal import to the prosecutor's assertion, where it had none. Any purported revocation was void and unenforceable under state and federal law. *See Brumfield v. Cain*, 576 U.S. 305 (2015) (state court unreasonably determined the facts where, as here, its factual finding conflicted with governing law).

### 2. The State Court Opinion Was Contrary To and An Unreasonable Application of Federal Law.

Setting aside the state court's erroneous factual conclusions, reasonable jurists would debate whether the state court opinion was contrary to or an unreasonable application of clearly established federal law. Even accepting the state court's unreasonable factual findings—i.e., that the prosecution validly repudiated the agreement at trial and informed Schrader of its repudiation before

he testified—this factual scenario still establishes due process violations under *Brady*, *Napue*, and *Giglio*.

The state court decision overlooked that, under Supreme Court precedent, due process does not require a witness's knowledge of a guarantee or binding contract to trigger the prosecution's disclosure obligations. This has been clearly established over decades of Supreme Court decisions. In fact, the Supreme Court has explained that the absence of a guarantee or binding agreement "served only to strengthen any incentive to testify falsely in order to secure a conviction." *Bagley*, 473 U.S. at 683; *see also Wearry*, 577 U.S. at 390 (due process violation where prosecution suppressed evidence that police told witness they would speak to prosecution about witness's request for reduction to his existing sentence in exchange for his testimony).

Given the meaningful risk of false testimony stemming from the incentives involved, "evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility." *Giglio*, 405 U.S. at 155. Due process is violated where the evidence of any understanding is suppressed or a witness falsely testifies about the existence of such an understanding. *Id.*; *see also Wearry*, 577 U.S. at 390 (failure to disclose evidence witness sought assistance in criminal proceedings); *Bagley*, 473 U.S. at 683 (failure to disclose possibility of reward); *Napue*, 360 U.S. at 270 (false testimony that there were no promises made).

Here, Schrader was offered and accepted a deal and, according to the state court, that deal was only repudiated immediately prior to Mr. Koehler's trial. But both Schrader and Fleury testified that Schrader had *never b*een promised anything. The state court's determination that he was therefore testifying without any incentives conflicts with clearly established federal law recognizing that a jury could have concluded he was still seeking to "curry favor" with the prosecution and was motivated to falsely testify in order to regain the agreement he had supposedly lost. *See Wearry*, 577 U.S. at 390; *Bagley*, 473 U.S. at 683. The state court failed to apply this clearly established federal law, and completely failed to evaluate the impact of Schrader and Fleury's false testimony. *See Giglio*, 405 U.S. at 155; *Napue*, 360 U.S. at 270; *Haskell*, 866 F.3d at 144, 146.

Finally, the state court indicated in passing that there was no prejudice to Mr. Koehler because "Schrader's testimony was not critical to Appellant's prosecution" in light of other evidence pointing to his guilt. *Koehler-2*, 36 A.3d at 138. The state court conclusion conflicted with clearly established federal law holding that materiality under *Brady* "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 434-35. The state court unreasonable failed to apply the proper materiality standard.

### 3. The District Court Erred.

The District Court adopted the state court's analysis in rejecting Mr. Koehler's *Brady* claim, concluding that there was no undisclosed deal at the time of Mr. Koehler's trial. DCO at *45-46. For the reasons stated above, it is at minimum debatable whether this analysis failed to consider significant errors that the state court made.

The District Court also separately addressed Mr. Koehler's *Giglio* claim and rejected it after concluding that because a "non-prosecution agreement did not exist at the time" Schrader testified, there was no evidence that the Commonwealth "knew or should have known of any alleged perjury." DCO at *48. This merely repeats the error the District Court made in its *Brady* analysis and was unreasonable for the same reasons. The factual record established that Schrader had a deal and later enforced that deal. While represented by counsel, Schrader testified to conduct that, absent an agreement, would have exposed him to capital prosecution. It violated Mr. Koehler's due process rights to prevent his defense from showing the falsity of Schrader's and Fleury's testimony that there had been no promises made with regard to his testimony. *See Giglio*, 405 U.S. at 155; *Wearry*, 577 U.S. at 390; *Bagley*, 473 U.S. at 683; *Napue*, 360 U.S. at 270.

The District Court compounded its error by applying the wrong harmless error test and concluding, without analysis, that the error did not have a

"'substantial and injurious effect or influence in determining the jury's verdict.'" DCO at *48-49 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). As this Court has made clear, *Brecht*'s harmless error analysis "does not apply to claims on habeas that the state has knowingly presented or knowingly failed to correct perjured testimony." *Haskell*, 866 F.3d at 152.

Mr. Koehler has shown it is more than debatable whether the state and lower courts erred in denying this claim. This Court should grant COA and decide the issue after full briefing on the merits.

## II.  REASONABLE JURISTS WOULD DEBATE WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD CONVICT MR. KOEHLER OF FIRST DEGREE MURDER WITHOUT FINDING THAT HE HAD THE SPECIFIC INTENT TO KILL AND THAT THEY COULD INFER SPECIFIC INTENT FROM THE ACTIONS OF AN ACCOMPLICE OR CO-CONSPIRATOR; AND REASONABLE JURISTS WOULD DEBATE WHETHER COUNSEL WAS INEFFECTIVE IN FAILING TO CLEARLY OBJECT TO THE COURT'S ERRONEOUS INSTRUCTIONS.

At Mr. Koehler's trial, the court failed to advise the jury that it could not find Mr. Koehler culpable as an accomplice or a co-conspirator to first degree murder without finding that he had the specific intent to kill. Instead, the court's instructions to the jury suggested that Mr. Koehler could be convicted of first degree murder based solely on the conduct and intent of another person. These instructions removed the Commonwealth's burden of proof as to a crucial element of the offense in violation of Pennsylvania law and Mr. Koehler's due process

rights. In failing to clearly object to the improper instructions, trial counsel violated Mr. Koehler's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments.

## A.    Background

### 1.  Relevant Facts

Mr. Koehler did not shoot the victims in this case. The Commonwealth alleged instead that Mr. Koehler had persuaded or coerced William Curley to shoot the victims, and it prosecuted Mr. Koehler for first degree murder under theories of conspiracy and accomplice liability. Mr. Koehler's defense was that even if he had been present and known about the crimes at issue, he had neither agreed to nor held the requisite intent to commit those crimes:

> [I]t is possible that Mr. Curley's testimony dealing with what happened is fundamentally accurate and, yet, at the same time, it is possible that when the defendant, by way of his interviews in Camden County and in Bradford County, said, I wasn't involved. He could be [sic] the Schrader home. He could be there, in a sense, as a—simply a witness. A witness in that he was there, not necessarily a witness to the killings. And yet all the physical evidence could remain valid and William Curley's statement about the physical evidence could remain valid. The physical evidence is not inconsistent with Mr. Koehler's assertion of innocence.
>
> …
>
> You look at the night of the 17th-18th, he had no sleep at all. So is it— is it disbelievable for the defendant to say, I was tired and I wanted to just drink some coffee and, when my friend was working on my car, I took some naps in the Schrader residence? You know, there's no

question but [Mr. Koehler] was tired and I would suggest that all he was doing that day was sleeping, Ladies and Gentlemen.

NTT 4/10/96 AM at 15, 55.

Following closing arguments, the court instructed the jury as follows on causation in criminal homicide and specific intent for first degree murder:

> I want you to recall that the Commonwealth alleges that the defendant is liable under the theory of accomplice liability and liable as a co-conspirator.
>
> You cannot find the defendant or an accomplice or a co-conspirator killed Regina Clark or Austin Hopper, unless you are satisfied, beyond a reasonable doubt, that the defendant's conduct or that of an accomplice or a co-conspirator was a direct cause of their deaths. In order to be a direct cause of a death, a person's conduct must be a direct and substantial factor in bringing about the death. There can be more than one direct cause of death. A defendant who is a direct cause of death may be criminally liable, even though there are other direct causes. A defendant's conduct may be a direct cause of a death, even though his conduct was not the last or immediate cause of the death. Thus, a defendant's conduct may be a direct cause of a death, if it initiates an unbroken chain of events leading to the death of the victim.
>
> I'll now give you the definition of first degree murder. I'm not going to give it twice. The definition will apply for both the murder that is charged of Regina Clark and the murder that is charged of Austin Hopper. First degree murder is a murder ***in which the killer has the specific intent to kill***. You may find the defendant guilty of first degree murder, if you are satisfied that the following three elements have been proven beyond a reasonable doubt. First, that Regina Clark, in the one charge, or Austin Hopper, in the other charge, is dead. Second, ***that the defendant or an accomplice or co-conspirator killed her***, Regina Clark, in the one charge, or him, Austin Hopper, in the other charge, and, third, ***that the defendant did so with the specific intent to kill and with malice***.

A person has the specific intent to kill, if he has a fully formed intent to kill and is conscious of his own intention. As my earlier definition of malice indicates, a killing by a person who has the specific intent to kill is a killing with malice. Stated differently, a killing is with specific intent, if it is willful, deliberate and premeditated. The specific intent to kill, including the premeditation needed for first degree murder, does not require planning or previous thought or any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the defendant can and does fully form an – an intent to kill and is conscious of that intention.

When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. If you believe that the defendant *or an accomplice or co-conspirator* intentionally used a deadly weapon on a vital part of the victim's body, you – you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

NTT 4/11/96 AM at 28-29 (emphasis added).

Prior to concluding the jury charge, the court held a side bar to allow counsel the opportunity to raise any objections. Defense counsel expressed a vague concern at this time that "the definitions and elements of murder one, murder two, murder three, kidnaping, conspiracy, concepts of co-conspirators and accomplice liability, … you know, this is the gravest of all the criminal prosecutions and—and the instructions are so complex, so difficult to understand." *Id.* at 36. Further, defense counsel stated,

Deep down inside, I just don't believe that the jurors could understand and I would ask, therefore, that the court make a further attempt to educate the jurors with respect to these concepts. I mean, there's a point

at which I think the State of Pennsylvania has to realize that these recommended instructions are inadequate.

*Id.* at 36-37. The court responded as follows:

> I agree that they are complex. I would be willing to give a shorthand synopsis that indicates that the Commonwealth alleges that the defendant committed these acts as a co-conspirator and/or as an accomplice and that, if they find that the acts were committed say by a co-conspirator or by someone who's acting as an accomplice and has done so in pursuance of their conspiracy or their partnership, then that act is deemed to be the act of the defendant. But I would have grave concern that any sort of shorthand recitation, in fact, would work prejudice to the defendant. I think it over simplifies it. . . .

> I think—I'm not trying to pat myself on the back, but I think the instructions I gave were as clear as instructions of these complex concepts can be made. . . . I emphasized—made emphasis to try to support the theories of liability from the definitions of the offenses themselves, because that's where they can, I think get confused. So I emphasized that to try to get some separation from that.

*Id.* Defense counsel then stated, "I don't believe the proposed shorthand restatement would be adequate," *id.*, but did not seek or suggest any other remedial instruction. The court did not provide any further instructions or clarifications to the jury regarding the specific intent required for first degree murder.

During deliberations, the jury requested that the court re-read the instructions for all three degrees of murder. NTT 4/11/96 PM at 1-6. The trial court did so, repeating the same instructions he had read earlier that day. *Id.*

## 2.  Applicable Law

The Due Process Clause of the Fourteenth Amendment requires the government to prove beyond a reasonable doubt every element of the crime with which a defendant is charged. *In re Winship*, 397 U.S. 358, 364 (1970). In keeping with this principle, due process "prohibits the State from making use of jury instructions that have the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of intent in a criminal prosecution." *Francis v. Franklin*, 471 U.S. 307, 326 (1985) (citing *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979)).

To demonstrate that a jury instruction has violated due process, a petitioner must show "(1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011). The "reasonable likelihood" standard is not a high bar, and the petitioner "need not establish that the jury was more likely than not" to have applied the instructions in an unconstitutional manner. *Hackett v. Price*, 381 F.3d 281, 291 (3d Cir. 2004).

In Pennsylvania, "first degree murder requires the specific intent to kill, and that mens rea is also required of accomplices and co-conspirators." *Laird v. Horn*,

414 F.3d 419, 425 (3d Cir. 2005); *see also Everett v. Beard*, 290 F.3d 500, 515 (3d Cir. 2002) ("[S]ince the legislature drafted the law on first-degree murder, 18 Pa. Cons. Stat. § 2502 (drafted 1972; revised 1974), Pennsylvania law has clearly required that for an accomplice to be found guilty of first-degree murder, s/he must have intended that the victim be killed."); *Smith v. Horn*, 120 F.3d 400, 410 (3d Cir. 1997) ("Under Pennsylvania law . . . an accomplice or co-conspirator in a crime during which a killing occurs may not be convicted of first-degree murder unless the Commonwealth proves that he harbored the specific intent to kill.") (citing 18 Pa. Cons. Stat. § 2502(a); *Commonwealth v. Huffman*, 638 A.2d 961, 962-63 (Pa. 1994); *Commonwealth v. Bachert*, 453 A.2d 931, 935 (Pa. 1982)).

In cases involving a first degree murder charge based on vicarious liability, jury instructions may violate due process even if they do not violate Pennsylvania law. *See, e.g.*, *Simpson v. Wetzel*, 485 F. Supp. 3d 545, 560 (E.D. Pa. 2020) ("Jury instructions in cases involving first-degree murder and a conspiracy or accomplice liability can meet Pennsylvania state standards but fail to meet federal due process standards."); *Bowers v. Wenerowicz*, No. CV 13-05550, 2016 WL 9306253, at *22 (E.D. Pa. Sept. 30, 2016) ("Accomplice liability and co-conspirator instructions in certain first-degree murder cases that have passed muster under Pennsylvania law have nonetheless been found to violate due process."); *Romero v. Beard*, No. CV 08-0528-KSM, 2024 WL 1975475, at *56 (E.D. Pa. May 2, 2024) (addressing the

46

"split of authority" between state and federal courts on this issue); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1158 (Pa. 2012) ("[T]he *Huffman* debates . . . have spanned the better part of a decade of this Court's jurisprudence. . . . The difficulty, however, is that the Third Circuit Court of Appeals appears to take an entirely different view as a matter of federal due process law.") (citing *Laird*, 414 F.3d at 425-30).

In *Laird*, this Court found a constitutional due process violation based on a reasonable likelihood that the jury applied general accomplice liability instructions in a way that relieved the Commonwealth of its burden of proving that the petitioner had the specific intent to kill. At trial, Laird and his co-defendant each testified that the other killed the victim, and although both defendants admitted they participated in kidnapping the victim, they each denied any intent to kill him or help the other kill him. *See Laird*, 414 F.3d at 426. The jury was then instructed in relevant part that "[a] person is guilty of a particular crime if he is an accomplice of another person who commits that crime," and "[y]ou may find a defendant guilty of first degree murder if you are satisfied that . . . a defendant or an accomplice of the defendant killed [the victim], [and] that the killing was with specific intent to kill." *Id.* This Court found these instructions erroneous because "the jury could easily have convicted Laird of first-degree murder based on his conspiring with [his co-defendant] to kidnap or assault [the victim] even if jurors

were not convinced beyond a reasonable doubt that Laird intended to kill him." *Id.* at 427; *see also id.* at 428 ("[T]he jury might have believed that Laird intended to kidnap and/or assault [the victim], but that only [Laird's co-defendant] intended to kill him.").

The Court then found this error was not harmless because, even though the evidence at trial was sufficient to establish that the killer had the specific intent to kill and Laird's co-defendant testified that Laird was the killer, this Court harbored "grave doubts" as to whether "the instructions explained that the killer's coconspirator must have also intended that [the victim] be killed." *Id.* at 429. The Court acknowledged that the testimony of several witnesses corroborated the co-defendant's testimony that Laird was the actual killer, and that "the severity and location of the wounds" left "little doubt that whoever inflicted them intended to kill [the victim]." *Id.* at 429. Nevertheless, the Court emphasized that the sufficiency of the evidence was "not the issue," and "[i]t was for the jury, not a court, to determine the identity and *mens rea* of the actual killer." *Id.*; *see also id.* ("[W]e can not substitute ourselves for the jury by speculating about what portion of the testimony the jury believed."). Because Laird was ultimately convicted of first, second, and third degree murder, as well as conspiracy, there was no way for the Court to determine whether the jury understood correctly that an accomplice to

first degree murder must also intend to kill the victim—and thus the error could not be harmless. *Id.* at 430.

More recently, this Court again found a due process violation based on erroneous jury instructions in *Tyson v. Superintendent Houtzdale SCI*, 976 F3d 382, 395 (3d Cir. 2020). The petitioner in that case, Tyson, was prosecuted as the getaway driver for another individual who shot and killed two men in a stopped van. *See id.* at 386. Although Tyson was charged only as an accomplice, the instructions at his trial problematically "defined both first and third degree murder by focusing entirely on the mental state of 'the killer.'" *Id.* at 387. The Court found these instructions were erroneous because they "imply the jury must only determine [the killer]'s state of mind in determining Tyson's guilt as an accomplice." *Id.* at 393; *see also id.* at 392 ("[W]e find a strong likelihood the jury convicted Tyson as an accomplice to first-degree murder without finding he possessed the specific intent to kill. Indeed, we could find no language in the instruction that would lead the jury to connect the requisite intent to kill to the role of an accomplice."). The Court found further that the instruction on general accomplice liability "only made it more likely that a reasonable juror would misapprehend the law," because that instruction "was general and defined an accomplice as one who intends to promote or facilitate 'a crime' . . . ." *Id.* at 393. The instruction thus erroneously implied that "if Tyson was an accomplice to 'a'

49

crime, he was an accomplice to any crime also committed, including first-degree murder." *Id.* at 394 (citing *Smith*, 120 F.3d at 414).

Finally, the Court found that "[i]n light of the instruction's profound impropriety, . . . trial counsel acted unreasonably in failing to object." *Id.* at 395. This failure was "particularly glaring given that the prosecutor's closing argument contained the same erroneous interpretation of Pennsylvania law." *Id.* at 395. In assessing prejudice, the Court considered "the absence of any concrete evidence of Tyson's intention to commit murder" and acknowledged that "Tyson's intent to kill could be proven through circumstantial evidence." *Id.* at 397. Importantly, however, the Court found that "[the state courts] ignored circumstantial evidence that could have supported the opposite conclusion"—namely, that Tyson "anticipated a confrontation of some kind but that [the killer] alone possessed the intent to kill." *Id.* Ultimately, the Court found that "[b]ecause the deficient instruction hindered the jury's assessment of important circumstantial evidence, it would be unreasonable to conclude that Tyson was not prejudiced by counsel's failure to object." *Id.* at 398.

**B.** **The Trial Court's Instructions Were Erroneous, and Counsel Was Ineffective in Failing to Clearly Object.**

**1.** **The Trial Court Erroneously Instructed the Jurors that They Could Convict Mr. Koehler of First Degree Murder Without Finding He Had the Specific Intent to Kill.**

The trial court's instructions erroneously suggested to the jury that Mr. Koehler could be convicted of first degree murder based on his accomplice or co-conspirator's state of mind, regardless of whether Mr. Koehler also shared that same state of mind. Like the instructions in *Tyson*, the instructions here defined first degree murder as "a murder in which *the killer* has the specific intent to kill." NTT 4/11/96 AM at 28 (emphasis added). There is a strong likelihood the jury interpreted this to mean that to convict Mr. Koehler of first degree murder under any theory of liability, they needed to find only that William Curley—i.e., "the killer"—had the specific intent to kill. This is the only logical conclusion because no Commonwealth witness or prosecutor ever contended that Mr. Koehler was "the killer," and thus there would be no basis for the jury to have understood "the killer" to mean Mr. Koehler.

The court's subsequent instructions likely compounded this misunderstanding: "Second, that the defendant *or an accomplice or co-conspirator* killed her . . . and, third, that *the defendant did so* with the specific intent to kill and with malice." *Id.* (emphasis added). As a matter of common sense and grammar, "did so" refers to "killed her" in the previous sentence—but, again, the

Commonwealth never argued that Mr. Koehler killed anyone. It is thus at least reasonably likely the jury understood this instruction to mean that Mr. Koehler could be convicted of first degree murder if they believed that "[Mr. Koehler] or [Curley] killed her . . . and . . . [Curley killed her] with the specific intent to kill." Because Mr. Koehler was prosecuted only under theories of conspiracy and accomplice liability, it would not have made sense in context of the trial for the jury to understand the instruction any other way.

Making matters worse, the court then misinformed the jurors that they could infer specific intent to kill based solely on Curley's actions:

> If you believe that the defendant ***or an accomplice or co-conspirator intentionally used a deadly weapon*** on a vital part of the victim's body, you – you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

NTT 4/11/96 AM at 29 (emphasis added). In conjunction with the immediately preceding instructions, this instruction likely solidified the jurors' misunderstanding that only the killer needed to have the specific intent to kill. No one ever suggested that Mr. Koehler intentionally used a deadly weapon in this case, so it would only make sense to interpret this instruction as meaning that Curley's use of a deadly weapon could establish the specific intent to kill required to convict Mr. Koehler of first degree murder.

Even if the jurors could have somehow gleaned correctly that Mr. Koehler also and separately needed to have the specific intent to kill, this instruction erroneously conveyed the message that Curley's use of a deadly weapon was sufficient on its own to support an inference that Mr. Koehler had the specific intent to kill. This is wrong as a matter of Pennsylvania law and is a violation of Mr. Koehler's federal due process rights. *See Huffman*, 638 at 962-63; *Winship*, 397 U.S. at 364; *Williams*, 637 F.3d at 223; *see also Muhammad v. Superintendent Fayette SCI*, No. 19-1905, 2021 WL 3662308, at *2 (3d Cir. Aug. 18, 2021) (finding error in the court's instruction to the jury "that it should convict for attempted homicide if 'the Defendant or an accomplice or a co-conspirator did the act or acts with specific intent to kill [the victim]'"); *Perez v. Rozum*, 488 F. App'x 656, 660 (3d Cir. 2012) (non-precedential) (finding that deadly weapon instruction was inapplicable where there was no evidence that the defendant had used a deadly weapon on a vital part of the victim's body, and finding further that "the jury may have believed—incorrectly—that it could infer his specific intent to kill from *anyone's* use of a deadly weapon on a vital part of [the victim]'s body") (emphasis in original). The prosecutor's closing argument reinforced this misunderstanding:

> The law states that you may presume, you may presume the existence of the intent to kill, without any specific words by the mere use of deadly force to a vital portion of the victims [sic] body. How many fatal wounds were there to that woman? Two. How many wounds to that little boy? Seven. You saw them, he was shot to pieces. There [sic] intent wasn't just maybe let's hurt him, that is the specific intent to kill.

NTT 4/10/96 PM at 35-36. As this Court observed in *Tyson*, "[a]lthough the counsel's arguments carry less weight with the jury than the trial court's instructions, the Commonwealth's blatant misstatement of the law certainly increased the likelihood that the jury interpreted the charge so as to relieve the Commonwealth of its burden of proof." *Tyson*, 976 F.3d at 396.

The trial court's errors were not harmless. The jury likely understood the court's instructions to mean that they could find Mr. Koehler guilty of first degree murder even if they believed that only Curley killed the victims and only Curley had the specific intent to do so. Like the instructions in *Tyson*, the instructions here were erroneous because they "imply the jury must only determine [the killer]'s state of mind in determining [Mr. Koehler]'s guilt as an accomplice." *Tyson*, 976 F.3d at 393. In other words, "the jury was instructed that as long as either [Mr. Koehler] or [Curley] killed Sharp, and as long as [Mr. Koehler] and [Curley] were accomplices in the robbery, [Mr. Koehler] could be found guilty of first-degree murder." *Smith*, 120 F.3d at 416.

The court's erroneous instructions were particularly problematic because the jury did not have much evidence from which it could legitimately infer that Mr. Koehler had the specific intent to kill. The only witnesses connecting Mr. Koehler to the crime were Kirk Schrader, William Curley, and Kerrien Ramsey, and all three were unreliable at best. Kirk Schrader was a suspected co-conspirator and

had incentive to testify consistently with the prosecution's theory. *See supra* Claim I. William Curley was the actual shooter and had clear reason to lie about Mr. Koehler's involvement so that he himself could escape the death penalty. *See* NTT 3/25/96 AM at 60-61 ("He's going to come in here and cooperate, and point the finger at [Mr. Koehler]. And maybe, just maybe . . . he won't be executed by the State of Pennsylvania."). Kerrien Ramsey was not an eyewitness to the murders, and her ability to relate a cohesive and reliable version of events was doubtful. *See, e.g.*, NTT 3/25/96 at 56-57 ("Kerrien Ramsey . . . is a pretty unusual individual. There are so many things that Kerrien Ramsey will testify to that won't make sense."); NTT 4/10/96 AM at 36 ("[W]e know [Kerrien Ramsey] has a psychiatric history. She takes medication. She's been hospitalized. She's left the hospital without approval."). The only other evidence implicating Mr. Koehler came from neighbors and acquaintances who indicated only that Mr. Koehler was present and might have known that Curley was committing the murders.

Just as in *Laird*, because Mr. Koehler was convicted of first, second, and third degree murder as well as conspiracy, "there is no way . . . to determine if the jury understood that an accomplice to a first-degree murder must also intend to kill the victim." *Laird*, 414 F.3d at 430. The jurors' confusion regarding the different mental states required for each of the three degrees of murder is apparent from their request that the court repeat those instructions. *See* NTT 4/11/96 PM at 1-6.

55

They easily might have believed, for example, that Mr. Koehler intended for Curley to assault the victims but only Curley intended to kill them. Such an agreement to engage in an intentional act resulting in an unintentional death might support a conviction under theories of vicarious liability for a lesser degree of murder—but not first degree. *See Laird*, 414 F.3d at 428 ("[T]he jury might have believed that Laird intended to kidnap and/or assault [the victim], but that only [his co-defendant] intended to kill him. Such a finding would have supported a conviction for second-degree murder under Pennsylvania's felony murder rule, but it would not support a finding of that shared specific intent necessary to convict Laird of conspiracy to commit first-degree murder."); *see also Commonwealth v. Fisher*, 80 A.3d 1186, 1195 (Pa. 2013) (holding that conspiracy to commit third degree murder is a cognizable offense in Pennsylvania); *Commonwealth v. Roebuck*, 32 A.3d 613, 619-20 (2011) (holding that a defendant may be convicted of third degree murder as an accomplice in Pennsylvania). It cannot be harmless error for Mr. Koehler to have been convicted of first degree murder in light of the evident uncertainty that the jury found he had the specific intent to kill.

## 2.  Counsel Ineffectively Objected to the Erroneous Instructions.

Mr. Koehler was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to clearly object to the improper instructions. Although Mr. Koehler's counsel raised a vague concern at sidebar that

the court's instructions were "so complex" and "so difficult to understand," NTT

4/11/96 PM at 36, he did not make a clear objection or specify what he wanted the

court to do. Counsel requested only "that the court make a further attempt to

educate the jurors with respect to these concepts," *id.* at 36-37, and after turning

down the court's offer to provide a "shorthand recitation,"[2] *id.* at 36, counsel did

not pursue the issue any further. Counsel never objected on grounds that the

instructions misstated the law and relieved the Commonwealth of its burden on a

crucial element of the offense but instead suggested that the complexity he

perceived was simply inherent in standard jury instructions. *See id.* ("[T]here's a

---

[2] Though counsel did not comment on this, the court's proffered "shorthand" suffered the same shortfall as its instructions. Specifically, the court's use of the general terms "these acts," "the acts," and "that act" would have reinforced the incorrect belief that Mr. Koehler could be convicted as an accomplice or co-conspirator of any crime committed by Curley, regardless of Mr. Koehler's state of mind with respect to that particular crime:

> I would be willing to give a shorthand synopsis that indicates that the Commonwealth alleges that the defendant committed ***these acts*** as a co-conspirator and/or as an accomplice and that, if they find that ***the acts*** were committed say by a co-conspirator or by someone who's acting as an accomplice and has done so in pursuance of their conspiracy or their partnership, then ***that act*** is deemed to be the act of the defendant.

NTT 4/11/96 PM at 36; *see also Tyson*, 976 F.3d at 394 (finding instructions erroneous because the jury that heard them could have found that "if Tyson was an accomplice to 'a' crime, he was an accomplice to any crime also committed, including first-degree murder") (citing *Smith*, 120 F.3d at 414).

point at which I think the State of Pennsylvania has to realize that these recommended instructions are inadequate.").

Trial counsel could not have had any strategic basis for failing to object to an instruction that lessened the Commonwealth's burden of proof and conflicted with well-established constitutional principles. "A reasonably competent attorney patently is required to know the state of the applicable law," *Everett*, 290 F.3d at 509, and state and federal law at the time of Mr. Koehler's trial made clear that an instruction "advis[ing] the jury that they may find an accomplice guilty of murder in the first degree even if he did not have the specific intent to kill" is "an outright misstatement of the law on a fundamental issue relating to culpability," *Huffman*, 638 A.2d at 963-64; *see also Francis*, 471 U.S. at 326.

Trial counsel's failure to effectively object to the problematic instruction was particularly pronounced in light of his argument that Mr. Koehler was merely present at the crime but not guilty as an accomplice or co-conspirator. *See* NTT 4/10/96 AM at 15. Given Mr. Koehler's defense was that he did not have the requisite state of mind to commit the crimes of which he was accused, counsel could have no reasonable strategic basis for failing to ensure the jury was properly and clearly instructed on the elements of these crimes. *See Tyson*, 976 F.3d at 397 ("While we recognize there are 'countless ways to provide effective assistance in any given case,' we cannot fathom a strategic reason for counsel's failure to object

58

to an instruction that eliminates the state's burden to prove an element of [first degree murder].") (quoting *Strickland*, 466 U.S. at 689).

Here, just as in *Tyson*, "it would be unreasonable to conclude that [Mr. Koehler] was not prejudiced by counsel's failure to object" because "the deficient instruction hindered the jury's assessment of important circumstantial evidence." *Tyson*, 976 F.3d at 396. Although circumstantial evidence arguably could support an inference that Mr. Koehler had the specific intent to kill, circumstantial evidence also could have supported the opposite conclusion. *See id.* at 397. The only two eyewitnesses who identified Mr. Koehler as having orchestrated the murders were Curley and Schrader, each of whom had strong motivation to shift blame and implicate Mr. Koehler. Mr. Koehler maintained at trial that he was asleep at the time of the murders because he had gotten "very little or no sleep" on the previous evening, NTT 4/10/96 AM at 55, and the jury had no concrete evidence of Mr. Koehler's participation in the murders, let alone his intentions.

### C.  Reasonable Jurists Would Debate The State and District Courts' Conclusions that The Jury Charge Was Correct and Clear When Read in Its Entirety.

The Pennsylvania Supreme Court "assum[ed] for purposes of argument that the portion of the charge cited by [Mr. Koehler] is in tension with our holding in *Huffman*," but nevertheless found that the "ineffectiveness claim fails for lack of prejudice" because

> [W]hen read in its entirety, the instruction correctly described accomplice liability and criminal conspiracy, the elements of first degree murder, including that the defendant must possess the specific intent to kill, and informed the jury that the Commonwealth bore the burden of proving every element of the crime beyond a reasonable doubt.

*Koehler-2*, 36 A.3d at 156.

The District Court similarly found that "Mr. Koehler's challenge to the specific intent to kill instruction lacks merit" because "[t]aken in context, the challenged accomplice liability charge was clear, as was the trial court's instruction on specific intent." DCO at *98. With respect to ineffective assistance,[3] the District Court agreed with the Pennsylvania Supreme Court that "[v]iewing the instruction as a whole, the jury was clearly instructed on the need to find Mr. Koehler himself possessed the specific intent to commit first degree murder." *Id.* at *99. The District Court also found that "[t]he instructions accurately recited Pennsylvania law" and that "the Pennsylvania Supreme Court's conclusion that Mr. Koehler's claim of ineffective assistance of counsel fails for lack of prejudice was not an unreasonable application of clearly established federal law." *Id.*

---

[3] In reviewing this claim, the District Court noted, "Mr. Koehler presented both his claims of denial of due process and ineffective assistance to counsel to the state courts, but the Pennsylvania Supreme Court addressed only the ineffectiveness claim in its decision affirming the denial of PCRA relief. Thus, the Court will apply de novo review to the due process claim, but will employ AEDPA review to the ineffectiveness claim." DCO at *94.

At minimum, reasonable jurists could debate the conclusion that the jury charge read in its entirety made clear that the jury needed to find Mr. Koehler had the specific intent to kill in order to convict him of first degree murder. Neither the Pennsylvania Supreme Court nor the District Court cited any portion of the charge clarifying the Commonwealth's burden to prove that Mr. Koehler had the specific intent to kill or correcting the erroneous specific intent instructions. Indeed, no such charge exists. Neither the conspiracy nor the accomplice liability charge referenced or explained the intent required for first degree murder:

> I am now going to give you some instructions relating to liability or criminal responsibility. You may find the defendant guilty of a crime, without finding that he personally engaged in the conduct required for commission of that crime or even that he was personally present when the crime was committed. *A defendant is guilty of a crime, if he is an accomplice of another person who commits that crime.* A defendant does not become an accomplice merely by being present at the scene and knowing about a crime. He is an accomplice, if, with the intent of promotion [sic] or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it or aids, agrees to aid or attempts to aid the other person in planning or committing it.

> You may find the defendant guilty of *a crime* on the theory that he was an accomplice, as long as you are satisfied, beyond reasonable doubt, *that the crime was committed and that the defendant was an accomplice of the person who committed it.* It does not matter whether the person you believe committed the crime has not been prosecuted or convicted, has been convicted of a different crime or degree of crime, has an immunity to prosecution or conviction or has been acquitted.

> A defendant may, by reason of being a member of a conspiracy, become liable for a crime he did not personally commit. *He may be found guilty under this conspiracy theory in some situations where he could not*

61

***be convicted under an accomplice theory.*** You may define—you may find the defendant guilty of the crime of murder, as a conspirator, if you satisfied [sic], beyond reasonable doubt, first, that the defendant agreed with William Curley that they or one or more of them would commit the crime of murder or that the defendant would aid William Curley in committing the crime, the crime of murder. Second, that the defendant so agreed with the intent of promoting or facilitating the commission of that crime. Third, that, while the agreement remained in effect, the crime of murder was committed by William Curley, and, fourth, that the crime of murder was committed by William Curley in furtherance of his and the defendant's common design.

NTT 4/11/96 AM 19-21. Just as in *Tyson*, "no language in the instruction … would lead the jury to connect the requisite intent to kill to the role of an accomplice." *Tyson*, 976 F.3d at 393.

Far from "clearly instruct[ing]" the jury on specific intent, DCO at *99, the court's charge taken as a whole likely further confused the issue by making it seem like specific intent was not at all relevant to considerations of accomplice or co-conspirator liability. The conspiracy charge referred to the "the crime of murder," but it nowhere specified degree or provided any instruction about a shared intent or specific intent to kill. The accomplice liability instruction referred only to "a crime" and included the ambiguous statement that "[i]t does not matter whether the person you believe committed the crime . . . has been convicted of a different crime or degree of crime." Just like the problematic instructions in *Laird* and *Tyson*, the use of the words "a crime" made it so "the jury could easily have convicted [Mr. Koehler] of first-degree murder based on his conspiring with [Curley] to kidnap or

assault [the victims] even if jurors were not convinced beyond a reasonable doubt that [Mr. Koehler] intended to kill him." *Laird*, 414 F.3d at 427; *see also Tyson*, 976 F.3d at 393 (finding that the instruction on general accomplice liability "only made it more likely that a reasonable juror would misapprehend the law" because that instruction "was general and defined an accomplice as one who intends to promote or facilitate 'a crime' . . .").

Because the vicarious liability instructions were provided separately in time and earlier than the murder instructions, the jury had no way of knowing the elements of first, second, and third degree murder when they heard the vicarious liability instructions, let alone understanding that an accomplice or co-conspirator needs to independently have the *mens rea* required for each respective crime. The instruction "He may be found guilty under this conspiracy theory in some situations where he could not be convicted under an accomplice theory" suggested vaguely that co-conspirator liability may be broader than accomplice liability, but the court never explained or contextualized this difference, thereby leaving the jury with only an uncertain impression that co-conspirator liability should be relatively easy for them to find.

Hearing the general vicarious liability instructions in combination with the improper murder instruction on specific intent, the jury likely understood (wrongly) that they could convict Mr. Koehler of first degree murder under an

63

accomplice liability or conspiracy theory so long as Mr. Koehler agreed that Curley would engage in an intentional act that resulted in a victim's death, regardless of whether Mr. Koehler specifically intended that death. In other words, the jury here may have believed that so long as they found that Mr. Koehler was Curley's accomplice or co-conspirator, then they could also convict Mr. Koehler of any crime that Curley committed, regardless of Mr. Koehler's participation or state of mind with respect to that particular crime. This Court has previously and repeatedly found such instructions to violate due process. *See, e.g.*, *Laird*, 414 F.3d at 427; *Tyson*, 976 F.3d at 394; *Smith*, 120 F.3d at 414.

For the reasons explained above, *see supra* Section B.2, reasonable jurists could also debate the District Court's conclusion that "the Pennsylvania Supreme Court's conclusion that Mr. Koehler's claim of ineffective assistance of counsel fails for lack of prejudice was not an unreasonable application of clearly established federal law." DCO at *99. The *Strickland* standard for prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Here, as in *Tyson*, this standard is at least arguably met because the jury well may have viewed the circumstantial evidence differently had they received proper instructions. *See Tyson*, 976 F.3d at 398 ("Because the deficient instruction hindered the jury's

assessment of important circumstantial evidence, it would be unreasonable to conclude that Tyson was not prejudiced by counsel's failure to object.").

*     *     *

The jury charge improperly relieved the Commonwealth of its burden to prove Mr. Koehler had the specific intent to kill in violation of Mr. Koehler's constitutional rights. Mr. Koehler's counsel performed deficiently in failing to effectively object to this erroneous instruction, and Mr. Koehler was prejudiced by this failure. Reasonable jurists would debate the correctness of the contrary reasoning and conclusions reached by Pennsylvania Supreme Court and the District Court, and this claim therefore "deserve[s] encouragement to proceed further." *Barefoot*, 463 U.S. at 893 n.4 (internal quotation marks and citation omitted).

### III. REASONABLE JURISTS CAN DEBATE WHETHER MR. KOEHLER WAS PREJUDICED BY TRIAL COUNSEL'S COMPLETE FAILURE TO INVESTIGATE AND PREPARE FOR THE PENALTY PHASE.

The Pennsylvania Supreme Court and the District Court both found that Mr. Koehler's defense counsel performed deficiently during the penalty phase of his trial. Despite counsel's admitted failures and the wealth of available mitigating evidence, however, both courts concluded that trial counsel's failures did not prejudice Mr. Koehler. These courts unreasonably discounted the mitigation evidence presented at the post-conviction proceedings, and reasonable jurists could

disagree with the conclusion that Mr. Koehler was not prejudiced by trial counsel's woefully deficient performance during the penalty phase of trial.

### A. Counsel Was Deficient in Failing to Investigate and Present Mitigating Evidence, and Mr. Koehler Was Prejudiced By Counsel's Failures.

Mitigation evidence plays a critical role in capital sentencing proceedings; without it, a sentencer cannot render the individualized decision required by the Eighth Amendment. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (holding that the Eighth Amendment requires "an individualized assessment of the appropriateness of the death penalty"); *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990) ("Death is not automatically imposed upon conviction for certain types of murder."); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development.").

In accord with this principle, capital counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" with respect to both guilt and penalty phase evidence. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 691); *see also* ABA Guideline 10.7(A) (2003) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt

and penalty."). Absent fulfillment of this duty, "counsel's failure to uncover and present voluminous mitigating evidence at sentencing [cannot] be justified as a tactical decision." *Wiggins*, 539 U.S. at 522; *see also Williams v. Taylor*, 529 U.S. 362, 395 (2000).

The *Strickland* standard for prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* To establish prejudice, a petitioner need not show "that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. In other words, a petitioner need not prove that a jury would have returned a verdict for life; instead, he need show only that a single juror may have voted differently. *Wiggins*, 539 U.S. at 537.

"In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 534. The "totality of the available mitigation evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams*, 529 U.S. at 397. "Because a Pennsylvania death sentence must be unanimous, a defendant can show prejudice 'if there is a reasonable probability that the presentation of the specific and disturbing evidence of childhood abuse and neglect as a mitigating factor would have convinced one juror to find the mitigating factors to outweigh' the aggravating factors." *Abdul-*

*Salaam v. Sec'y of Pennsylvania Dep't of Corr.*, 895 F.3d 254, 269 (3d Cir. 2018)

(quoting *Jermyn v. Horn*, 266 F.3d 257, 286 (3d Cir. 2001)) (alteration omitted).

Mr. Koehler was denied his Sixth Amendment right to the effective assistance of counsel when his trial counsel failed to investigate mitigating evidence and, as a result, failed to present any significant mitigating evidence at trial regarding Mr. Koehler's traumatic life history and mental and emotional impairments. Counsel decided not to prepare any defense against the death penalty because, in counsel's own words, "[i]f you win the guilt phase of the trial, you don't have to worry about mitigation and sentencing." NTT 5/31/06 PM at 6.

Counsel collected no background records pertaining to Mr. Koehler's schooling, medical history, or military service and never had Mr. Koehler evaluated by any mental health expert. Counsel did not speak with any potential penalty phase witness until after the trial was already underway, and he ultimately presented only one witness during the mitigation phase: Mr. Koehler's mother, Louise Joy Tumminia. Ms. Tumminia—whose entire testimony comprises barely five total pages of transcript—told the jury only that she and Mr. Koehler's father divorced when Mr. Koehler was a young child, that she worked two jobs to try and make ends meet and therefore did not spend much time with her four children, and that Mr. Koehler's father "would be physically abusive" when she was not home. NTT 4/12/96 at 21-25. Including opening and closing statements from both parties,

as well as the charge of the court, the entire penalty phase lasted less than an hour. *See* NTT 4/12/96 Index (noting the start of opening statements at 11:03 AM and recess at 12:00 noon). At the close of the penalty phase, the jury sentenced Mr. Koehler to death based on their finding of two aggravating circumstances and no mitigating circumstances.

Several years later, Mr. Koehler introduced evidence in postconviction proceedings that significantly expanded on the minimal testimony presented at the penalty phase and provided new support for the proffered mitigating circumstances. This included: 1) dramatic evidence narrating the nature, extent, and frequency of violence in the household, including evidence that the violence was so extreme that it gave family members panic attacks; 2) significant evidence of mental health issues that impacted Mr. Koehler's ability to perceive and interact with the world around him; 3) a powerful illustration of Mr. Koehler's unstable, chaotic home environment; 4) the desperate poverty in his childhood home leading to food insecurity and squalid surroundings; and 5) additional, previously unheard evidence that fleshed out Mr. Koehler's upbringing, experiences, and humanity. Mr. Koehler also presented, for the first time, expert testimony regarding the psychological impact of the abuse, neglect, and trauma that he endured.

Counsel's failures prejudiced Mr. Koehler. The evidence presented at Mr. Koehler's postconviction proceedings was patently different in kind and in nature

from what was presented at trial. All of this evidence was available at the time of trial and could have been presented to the jury, if not for counsel's wholesale failure to investigate and prepare for the penalty phase. This evidence would have provided the jury with significant details that would have changed the overall picture of the nature, frequency, and scope of the physical abuse that dominated Mr. Koehler's upbringing.

For example, rather than hearing only that Mr. Koehler's parents were divorced, the jury would have learned from multiple witnesses that Mr. Koehler's parents regularly engaged in such violent fights in front of their children that Mr. Koehler's sister began suffering panic attacks as a result. NTT 5/31/06 at 15, 28-29. Additionally, the jury would have learned that this violence was also directed toward the children; the PCRA witnesses testified that Mr. Koehler's father would regularly get intoxicated and beat Mr. Koehler and his siblings, oftentimes with a belt, *id.* at 31-32, and frequently leaving visible injuries, *id.* at 16-17. And rather than hearing only that Mr. Koehler's mother worked two jobs, the jury would have heard that Mr. Koehler and his three sisters, who were often left alone to fend for themselves, "didn't always have food in the house." *Id.* at 37. Like in *Abdul-Salaam*, this additional evidence "could have changed the picture of [the petitioner's] childhood from one that was abusive and poor in a general sense . . . to one that appears to have been dominated by severe and pervasive violence at the

hands of his father and poverty that often rose to the level of serious deprivation." 895 F.3d at 272.

Furthermore, the jury would have heard from an expert witness who could and would have explained the ongoing significance and impact of Mr. Koehler's traumatic history. Dr. Edward Dougherty, Ph.D., testified at the PCRA hearing that Mr. Koehler's history resulting in overwhelming feelings of abandonment, which later resulted in Mr. Koehler's withdrawal and development of a personality disorder. NTT 5/31/06 AM at 102-04, 113-14, 119-20, 124. Specifically, Mr. Koehler suffers from a personality disorder with borderline and antisocial features. *Id.* at 119-20. Mr. Koehler's personality disorder is marked by unstable interpersonal relationships, "frantic efforts to avoid real or imagined abandonment," identity disturbance, impulsivity, chronic feelings of emptiness, inappropriate intense anger, and characteristics of dissociation. *Id.* at 174-76. Mr. Koehler also suffers from Attention Deficit Hyperactivity Disorder (ADHD), a disorder that affects impulse control. *Id.* at 115-16, 220. Dr. Dougherty summarized that Mr. Koehler suffers from the following:

> A chaotic family background and an unstable environment, which contributed to his ability to deal with human beings in a positive way; an untreated attention deficit hyperactive disorder; and a developed borderline personality disorder, which interfered to his ability to function appropriately at all times.

*Id.* at 130.

Had the jury heard the wealth of mitigating evidence that an effective lawyer would have presented, they likely would have found at least one mitigating factor to weigh against the aggravators. Particularly given the jury did not find all three aggravators advanced by the Commonwealth, it is reasonably probable that at least one of the jurors would have voted differently if they had heard more than only a scant few minutes' testimony from Mr. Koehler's mother.

### B. Reasonable Jurists Could Disagree With The State and District Courts' Conclusions That Mr. Koehler Was Not Prejudiced By His Counsel's Decision To Prepare No Penalty Phase Evidence.

In reviewing this claim, the Pennsylvania Supreme Court "assum[ed]" that "trial counsel's stewardship was constitutionally deficient" and conceded that "the testimony presented at the PCRA hearing … contained much more detail and painted a clearer picture of [Mr. Koehler's] unfortunate childhood" than what the jury heard. *Koehler*, 36 A.3d 121, at 151. Nevertheless, the court proceeded to find that "[s]uch evidence … pales in comparison with the aggravating circumstances found by the jury"—namely, that Mr. Koehler was convicted of more than one murder and the second victim was a child. *See id.* at 151-52 (citing 42 Pa. C.S. § 9711(d)(11); 42 Pa. C.S. § 9711(d)(16)). The weight of these two aggravating circumstances led the court to the "inescapable conclusion" that Mr. Koehler was not prejudiced by his counsel's deficient performance. *Id.* at 152 ("The fact that the second victim was a defenseless child weighs far heavier in aggravation.").

The District Court similarly discounted the mitigating evidence presented during postconviction proceedings. After finding that "defense counsel's investigation and resulting presentation of mitigating evidence from one lay witness was not objectively reasonable," the District Court "agree[d] with the Pennsylvania Supreme Court that Mr. Koehler was not prejudiced by his counsel's failure to investigate and present mitigating evidence at the penalty phase." DCO at *49-50. Specifically, the court found that "Mr. Koehler has not made a sufficient showing that the outcome of the penalty phase of his trial would have been different." *Id.* at *50. In the District Court's view, "the information presented at the PCRA hearing did little more than provide further detail as to the unfortunate childhood about which the jury already heard," and the expert testimony at the PCRA hearing "was not compelling." *Id.*

As an initial matter, the District Court applied an erroneous standard to assess prejudice in this case. The prejudice inquiry asks not whether the outcome *would have been* different, but whether there is "a reasonable probability" that the outcome would have been different but for counsel's failures. *Strickland*, 466 U.S. at 694. As this Court has explained previously, "[f]ormulating the test in [a '*would have*'] fashion places a higher burden on [the petitioner] than *Strickland* requires. . . . If the PCRA court indeed applied a heightened, outcome-determinative standard, its analysis would thus reflect a misapplication of *Strickland*." *Saranchak v. Sec'y,*

73

*Pa. Dep't of Corr.*, 802 F.3d 579, 600 (3d Cir. 2015) (citing *Strickland*, 466 U.S. at 694); *see also Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test."). Here, the District Court erroneously applied this "would have" standard to determine that Mr. Koehler did not suffer prejudice from counsel's failures during the penalty phase. *See* DCO at *50 ("Mr. Koehler has not made a sufficient showing that the outcome of the penalty phase of his trial *would have been* different."). This standard unfairly heightened the burden on Mr. Koehler to show prejudice and is incompatible with clearly established federal law.

Even setting aside the application of this erroneous standard, reasonable jurists could debate the District Court's conclusion that the Pennsylvania Supreme Court's analysis was not contrary to or an unreasonable application of clearly established federal law. The Pennsylvania Supreme Court acknowledged that the evidence presented at Mr. Koehler's PCRA hearing "was informative as it illustrated effectively that [Mr. Koehler] was neglected and abused as a child, having been raised in an environment lacking supervision, stability, and love." *Koehler-2*, 36 A.3d at 151. This notwithstanding, the state court found that "the mitigation evidence of [Mr. Koehler's] unfortunate childhood is clearly outweighed by the aggravating circumstance of senseless multiple murders of two innocent victims," and thus it was an "inescapable conclusion" that "there is no reasonable probability that one juror

74

would have struck a different balance and voted not to impose the death penalty." *Id.* at 151-52. The District Court essentially repeated the same basic analysis, briefly acknowledging the additional mitigation evidence offered in postconviction but quickly finding no prejudice because "the jury was tasked with the burden of weighing this mitigation evidence with the overwhelming evidence in support of three aggravating factors offered by the Commonwealth." DCO at *50. The District Court did not directly compare the mitigating evidence with the aggravating evidence but instead seemed to assume that every juror would agree that the aggravating evidence was "overwhelming," even in the face of substantial additional mitigating evidence. The District Court also failed to acknowledge that although the Commonwealth offered three aggravating circumstances, the jury ultimately found it only proved two.

Rather than parroting the Pennsylvania Supreme Court's analysis and conclusion unduly emphasizing the weight of the aggravators in this case, the District Court should have recognized that the state court's ruling was unreasonable. In *Williams v. Taylor*, the Supreme Court observed that, although the state court "correctly emphasized the strength of the prosecution evidence supporting the future dangerousness aggravating circumstance," it "failed to accord appropriate weight to the body of mitigation evidence available to trial counsel." 529 U.S. at 398. In analyzing prejudice, the necessary inquiry is whether "[t]he

undiscovered 'mitigating evidence, *taken as a whole*, "might well have influenced the jury's appraisal" of [the defendant's] culpability.'" *Rompilla*, 545 U.S. at 393 (quoting *Wiggins*, 539 U.S. at 538, and *Williams*, 529 U.S. at 398).

Contrary to the Pennsylvania Supreme Court's apparent belief here, this rule does not have an exception for highly aggravated cases. *See, e.g.*, *Rompilla*, 545 U.S. at 378 (finding *Strickland* prejudice where defendant committed murder by torture and had significant history of violent felonies, including rape); *Williams*, 529 U.S. at 418 (finding *Strickland* prejudice where defendant savagely killed a man with a mattock, beat an elderly woman into a permanent vegetative state, stole two cars, set fire to a home and the city jail, and stabbed a man during a robbery); *Bond*, 539 F.3d at 262 (finding prejudice where aggravating circumstances included murder while committing another felony and a an additional murder ten days earlier); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("[O]ur cases . . . firmly establish[] that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, *notwithstanding the severity of his crime* . . . .").

Here, as in *Porter*, the state court "unreasonably discounted the mitigation evidence adduced in the postconviction hearing." 558 U.S. at 42. The court also unreasonably discounted the value of the detailed lay witness testimony that

counsel could have presented had they thoroughly investigated and prepared their case. In short, the Pennsylvania Supreme Court failed to recognize that prejudice exists where "counsel presented some mitigation evidence but could have introduced evidence that was upgraded dramatically in quality and quantity." *Bond*, 539 F.3d at 291.

Had the state court adhered to these principles of clearly established federal law, it would have become evident that it is far from an "inescapable conclusion" that there is no reasonable probability that even a single juror in this case might have found that the totality of available mitigation evidence outweighed the aggravating evidence. Even in highly aggravated cases, jurors have routinely sentenced defendants to life instead of death. In *Commonwealth v. Barreto*, 2012 Phila. Ct. Com. Pl. LEXIS 499 (Aug. 21, 2012), the defendant was sentenced to life for three murder convictions after he opened fire on a car of unarmed teenaged boys. In *Commonwealth v. Torres*, 2013 WL 11276795 (Pa. Super. Ct. 2013), the defendant was sentenced to life for a murder conviction after he beat a three-year-old child to death while babysitting. The child suffered over 90 injuries, including a skull fracture and brain hemorrhages, severe lacerations to the liver causing internal bleeding, and scalding burns on his lower body. *See id.* at *4. In *Commonwealth v. Page*, 59 A.3d 1118 (Pa. Super. Ct. 2013), the defendant was sentenced to life for a murder conviction after he sexually assaulted his 23-month-

old daughter, including by kicking her in the vagina while wearing a Timberland boot, and then left her outside to freeze to death in single-digit February temperatures. These cases represent only a tiny fraction of the total universe of highly aggravated cases in which jurors rejected the death penalty. *See* Russell Stetler et. al., *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where the Death Penalty Was Rejected at Sentencing*, 51 Hofstra L. Rev. 89 (2022) (collecting over six hundred cases supporting the point that "the effective investigation and presentation of mitigating evidence can forestall a death sentence no matter how death-worthy the crime facts may appear at first glance").

Even if there were such a thing as a case that is "too aggravated to mitigate," it would certainly not be this one. Mr. Koehler did not kill anyone, and neither of the two men who participated in the killings were sentenced to death. Mr. Koehler was convicted under theories of conspiracy and accomplice liability—and there is a reasonable likelihood that the jury convicted Mr. Koehler of first degree murder without having found that he had the specific intent to kill. *See supra* Claim II. Notably, the jury did not find the first aggravating circumstances proffered by the Commonwealth, i.e., that the defendant contracted to pay another person or had conspired to pay another person for the killing of the victim. *See* NTT 4/12/1996 at 38, 43. These facts simply do not lead to the "inescapable conclusion" that two

aggravators found in this case would necessarily have outweighed the totality of available mitigation evidence in the minds of every juror at Mr. Koehler's trial.

At bare minimum, reasonable jurists could debate the District Court's conclusion that Mr. Koehler suffered no prejudice from his counsel's decision to investigate and prepare no penalty phase evidence, particularly in light of constitutional precedent emphasizing the importance of mitigation evidence as a fundamental tenet of capital jurisprudence. *See Penry*, 492 U.S. at 319; *Blystone*, 494 U.S. at 305; *Woodson*, 428 U.S. at 304. Reasonable jurists could also debate the District Court's conclusion that the state court's prejudice analysis was not an unreasonable application of the facts in the state court record or of clearly established federal law. This Court therefore should grant a COA and allow Mr. Koehler the opportunity to pursue this claim further.

## IV. REASONABLE JURISTS COULD DEBATE WHETHER PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE BECAUSE OF THE CUMULATIVE PREJUDICE OF THE ERRORS DESCRIBED ABOVE.

Cumulative error can give rise to a constitutional violation. *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639-42 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973). The Third Circuit recognizes the same principle. *See Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (quoting *Albrecht v. Horn*, 471 F.3d 435, 468 (3d Cir. 2006)); *see also Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002) (finding that certain

errors, though harmless when viewed individually, may be so prejudicial when taken cumulatively as to warrant a new trial) (citing *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980)). In *Collins v. Sec'y, Pa. Dep't of Corr.*, 742 F.3d 528 (3d Cir. 2014), this Court held that cumulative error is not simply a way of measuring prejudice but rather a "standalone claim" that due process was violated as a result of multiple errors. *Id.* at 542. The Court reiterated that "[c]umulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict . . . ." *Id.* (quoting *Fahy*, 516 F.3d at 205).

While each constitutional violation in this case requires relief individually, the cumulative prejudicial effect of the multiple violations requires relief as well. As a result of the *Brady/Napue* violation, the court's erroneous jury instructions, and counsel's ineffectiveness, Mr. Koehler did not receive a fair trial. Evidence that discredited the Commonwealth's case was not presented, and the Commonwealth actively misrepresented that no such evidence existed. The suppressed evidence was critical to evaluating whether Mr. Koehler was involved in the murder. The two key witnesses in the case that established Mr. Koehler's specific intent to kill the victims were Curley and his best friend Schrader. The suppressed evidence would have significantly undermined Schrader's testimony, leaving the jury to rely solely on the word of the admitted killer.

80

Although evidence presented at trial raised reasonable doubt as to whether or not the Commonwealth had proven Mr. Koehler had the specific intent to kill, the jury was not informed that it needed to find Mr. Koehler had the specific intent to kill in order to find him guilty of first degree murder as an accomplice or co-conspirator. To the contrary, the jury was instructed to focus on "the killer's" intention and use of a deadly weapon, and further instructed that it could find Mr. Koehler guilty of effectively any crime committed by his accomplice or co-conspirator. Had the *Brady* evidence been disclosed, the *Napue* errors corrected, and the jury properly instructed, there is a reasonable probability that the jury would have reached a different verdict on the charge of first degree murder.

Moreover, the Commonwealth rested on the trial evidence in support of its death sentence. Mr. Koehler did little more at trial than plead for the jury to sentence him to life because Curley was the actual shooter. The impact of the due process violations, coupled with the ineffective assistance of penalty phase counsel, combine to render Mr. Koehler's death sentence constitutionally unreliable.

Mr. Koehler raised a cumulative error claim in his federal habeas petition, and the District Court dismissed it as meritless on grounds that it already found "all of Mr. Koehler's claims relating to both the guilt phase and the sentencing phase to be meritless." DCO at *104. Further, the District Court added that "[e]ven

81

considering cumulatively the few instances of harmless error identified by Mr.

Koehler and recognized by the Court, their overall effect is not so prejudicial to the

fairness of the proceedings as to warrant a new trial." *Id.* Reasonable jurists could

debate this conclusion. For the reasons explained above, each of the three claims

above has merit individually, and their prejudicial impact on Mr. Koehler's trial is

even greater when considered cumulatively. Even if Mr. Koehler were not entitled

to relief based on any individual claim, he nevertheless would be entitled to relief

because the errors collectively had a substantial and injurious effect and influence

in determining the jury's verdict.

## CONCLUSION

For all the reasons set forth above, this Court should grant a certificate of

appealability with respect to the aforementioned claims.

Respectfully submitted,

/s/ Tracy Ulstad
TRACY ULSTAD
Assistant Federal Defender
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Curtis Building, Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Appellant John Koehler*

Dated: January 8, 2025

## CERTIFICATE OF SERVICE

I, Tracy Ulstad, Assistant Federal Defender, Federal Community Defender

Office for the Eastern District of Pennsylvania, hereby certify that on January 8,

2025, I caused a copy of the foregoing motion for extension of time to be filed and

served electronically through Electronic Case Filing on:

Gregory J. Simatic
Deputy Attorney General
Pennsylvania Office of Attorney General
Criminal Law Division, Appeals Section
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222

/s/ Tracy Ulstad
Tracy Ulstad
Assistant Federal Defender