## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

### No. 24-9000

_____

### JOHN KOEHLER,

**Petitioner/Appellant**

**v.**

### LAUREL HARRY, Secretary,
### Pennsylvania Department of Corrections, et al.,

**Respondents/Appellees**

### RESPONSE OPPOSING  APPLICATION
### FOR CERTIFICATE OF APPEALABILITY

DAVID W. SUNDAY, JR., Attorney General of Pennsylvania, by

GREGORY J. SIMATIC, Deputy Attorney General, on behalf of appellees,

respectfully opposes the appellant's application for certificate of appealability, and

so states:

## Introduction

On April 18, 1995, 18-year-old William Curley, acting at the explicit

direction of Petitioner/Appellant John Koehler, shot and killed Koehler's paramour

Regina Clark and her nine year-old son, Austin Hopper.  Curley testified against

Koehler pursuant to an agreement with the Commonwealth.  Koehler was

1

convicted of two counts of first-degree murder on April 11, 1996 and sentenced to death the following day.

Koehler's conviction and sentence have been upheld throughout his state court litigation and by the District Court in his subsequent federal habeas proceedings. The District Court announced its decision in a 207 page opinion that was issued on May 14, 2015. This opinion will hereinafter be referred to as the DCO. That decision denied both Koehler's petition for writ of habeas corpus as to all of his claims and also denied a certificate of appealability. Further proceedings in federal court were delayed while Koehler pursued claims in state court that were based on alleged newly-discovered evidence. These latter claims have been rejected by the state courts and are irrelevant to the instant matter. At the conclusion of the state court litigation of those claims,[1] Koehler filed a motion for reconsideration under Fed.R.Civ.P. 59(e) that was denied on April 1, 2024. The District Court again denied a certificate of appealability. Koehler now seeks said certificate from this Court.

---

[1] Koehler filed an appeal from the denial of his most recent PCRA petition in the Pennsylvania Supreme Court at docket number 814 CAP. The issues in that case are unrelated to both his claims in the instant matter and his allegations of newly-discovered evidence. The Supreme Court affirmed the denial of the most recent PCRA petition on February 19, 2025.

**Relevant facts and procedural history**

The evidence presented at Koehler's trial established the following, as recited in the Pennsylvania Supreme Court's opinion on direct appeal in *Commonwealth v. Koehler*, 737 A.2d 225 (Pa. 1999) (*Koehler I*). In August of 1994, Koehler informed 18 year-old William Curley that he was a "hit man" for the mob. Koehler attempted to recruit Curley into his "profession" by promising that Curley could earn "six digits." Curley entertained the proposition, believing that he would only kill drug dealers and individuals connected with the mob, not innocent people.

Eight months later, on April 17, 1995, while Curley was staying at the home of his friends, Melissa Mack and Ricky Hunsinger, Koehler informed Curley that he was bringing "two packages" and wanted Curly to "deliver them." Unbeknownst to Curley, Koehler meant that he was bringing two individuals to Curley, and wanted Curley to kill them. Curley unwittingly agreed. On April 18, 1995, at 4:00 a.m., Koehler arrived at the Mack/Hunsinger residence, accompanied by Regina Clark, with whom Koehler had a romantic relationship, and Clark's nine year-old son, Austin Hopper. Melissa Mack had the opportunity to observe Clark and her son while they stayed in Mack's home. It is unclear why Koehler chose Clark to be the victim of Curley's first killing.

3

Shortly after Koehler arrived, he explained to Curley that he wanted him to kill Clark. Curley, however, stated that he did not want to participate in the murder. In response, Koehler threatened that if Curley refused to kill Clark, Koehler would kill Curley. Koehler also gave Curley a loaded .22 caliber Beretta handgun to use for the murder, and the two men located an abandoned refrigerator at a dump where they could dispose of Clark's body after the shooting. Curley again told Koehler that he did not want to kill Clark, to which Koehler responded, "kill or be killed." The men thereafter agreed that Curley would kill Clark later that afternoon on Stone Jug Road.

Before acting upon their plans, Koehler and Curley drove Clark and Austin to a restaurant. Koehler entered the restaurant, while Curley, Clark, and Austin drove off, purportedly to retrieve another vehicle. The true purpose of the diversion was for Curley to kill Clark on Stone Jug Road. Curley drove to that location with Clark and Austin, and pointed a gun to the back of Clark's head. Neither Clark nor Austin observed the gun. Curley, however, could not pull the trigger, and, instead drove Clark and Austin back to the restaurant to rejoin Koehler.

That same afternoon, Koehler and Curley discussed where the murder should take place, and decided that it would occur at the home of Janet Schrader, as Curley was a friend of Schrader's son, Kirk. Hours later, Curley proceeded to the Schraders' residence, accompanied by Koehler, Clark, and Austin. Everyone

4

entered the Schraders' home, with the exception of Curley, who remained in the garage. Koehler and Kirk Schrader later joined Curley in the garage to discuss ways to kill Clark. When Curley told Koehler that he did not think he could execute the plan, Koehler responded that Curley had to kill Clark. Ultimately, Curley waited in the garage alone, and when Clark entered, shot her three times in the head. Curley then placed Clark in the trunk of his car. Koehler came to the garage to check Clark's pulse, and believed she was still alive. Koehler then suggested that Curley slit Clark's throat. Curley grabbed a knife, and then he and Kirk Schrader entered the car and drove off, hearing a thumping noise emanating from the trunk.

Curley dropped Kirk off at the home of Kirk's friend, Roger Hitchcock, and proceeded to dispose of Clark's body in the abandoned refrigerator at the dump. Curley slightly cut Clark's throat with the knife, closed the refrigerator door, and returned to the Schraders' residence. When he arrived, Koehler told Curley that Clark's nine year-old son, Austin, was a "loose link," and had to be killed. Shortly thereafter, Curley accompanied Austin to the garage, and shot him three times in the head and twice in the body. Curley then drove to "Snake Road," and placed the child's body in a sluice pipe.

When Curley arrived back at the Schraders' residence, he and Koehler cleaned the garage where the shootings took place. The two men thereafter

returned to the abandoned refrigerator to secure it with a lock and chain, but the chain was too short. The men then drove to "Twin Ponds," where, upon Koehler's suggestion, Curley disposed of the knife and the gun used in the murders. Koehler later drove Curley to the Mack/Hunsinger residence, left him, and drove away. The following week, Curley moved to North Carolina.

Eight days after the murders, on April 26, 1995, a man searching for recyclables at the dump discovered Clark's body in the abandoned refrigerator, and contacted the police. Melissa Mack, with whom Koehler, Curley, and Clark had stayed prior to the killings, heard a news broadcast, which indicated that a woman's body wearing particular clothing had been discovered one-half mile from Mack's home. Mack recognized the clothing as that worn by Clark on the day of the shooting, and called police. Mack later identified the body discovered in the refrigerator as Clark's, and told police that Clark had been travelling with a child. Mack further consented to a search of her home, which revealed, *inter alia*, a lock and bullets.

On April 28, 1995, police officers travelled to North Carolina to interview Curley. Curley confessed to the shootings and told the officers where the boy's body could be found. He also revealed Koehler's involvement in the crimes, and disclosed where they had discarded the murder weapon. At 11:00 p.m. that evening, the police found Austin's body, and later recovered from Twin Ponds the

gun and knife used in the murders. The police thereafter arrested Curley and

charged him with the first degree murders of Clark and Austin, various counts of

criminal conspiracy, kidnapping, and aggravated assault, and one count each of

endangering the welfare of a child and possession of an instrument of crime. The

police also subsequently arrested Koehler for the first degree murders of Clark and

Austin, and charged him with related offenses. The Commonwealth tried Curley

and Koehler separately, prosecuting Curley first.

Curley waived his right to a jury, and proceeded to a bench trial based on

stipulated facts on March 6, 1996. Immediately prior to Curley's trial, however, the

Commonwealth *nolle prossed* all the lesser charges against Curley, and proceed to

prosecute him for two counts of first degree murder and one count of burglary.

During Curley's trial, the Commonwealth's theory of criminal liability was that

although Koehler solicited Curley to kill Clark and Austin, Curley acted with his

own free will in carrying out the crimes. Curley was thereafter convicted of two

counts of first degree murder and one count of burglary.

On March 25, 1996, after Curley was convicted, but prior to his penalty

proceeding, Koehler's trial commenced. To demonstrate Koehler's criminal liability

for the first degree murders of Clark and Austin based on a conspiracy and

accomplice theory, the Commonwealth presented Curley's testimony, which

described in detail Koehler's participation in the crimes. Curley informed the jury

7

that in exchange for his testimony against Koehler, the Commonwealth would stipulate in Curley's upcoming penalty proceeding that his cooperation served as mitigating evidence. The Commonwealth also presented the testimony of Kirk Schrader, who testified that he observed Curley and Koehler discuss plans to kill Clark on the day of the murders. He explained that later that day, he heard gunshots being fired in his garage and saw Curley in the garage with his arm extended. The cars in the garage purportedly blocked Schrader's view of Curley's gun and Clark. Schrader further testified that he did not receive anything from the Commonwealth in exchange for his testimony.

The Commonwealth also presented the testimony of a forensic pathologist, who opined that the cause of Clark's death was a gunshot wound to the head, and the manner of her death was homicide. The forensic pathologist further testified that the cause of Austin's death was multiple gunshot wounds, and that the manner of his death was homicide. Additionally, Kerrien Ramsey testified that she had travelled with Koehler, Clark, and Austin, before the murders in February or March of 1995, and that Koehler showed Ramsey a loaded gun and told Ramsey that he would kill Clark.

On April 11, 1996, the jury convicted Koehler of two counts of first degree murder, two counts of conspiracy to commit murder, two counts of kidnapping, and one count of burglary.

At the penalty phase of the trial, the Commonwealth urged the jury to find three aggravating circumstances: (1) Koehler's conviction of another murder either before or at the time of the offense at issue, 42 Pa.C.S. §9711(d)(11) (relating to both murders); (2) that the victim was less than twelve years' old, *id*. §9711(d)(16) (relating only to Austin's murder); and (3) that the defendant paid or had contracted to pay or be paid by another person for the killing of the victim. *Id*. §9711(d)(2). As mitigating evidence, the defense presented only the testimony of Koehler's mother, who explained that she divorced Koehler's father when Koehler was seven years old, that she was rarely home as she worked two jobs, and that her ex-husband had been physically abusive to Koehler. See N.T. Apr. 12, 1996, at 21–25.

As to the first degree murder of Clark, the jury found one aggravating circumstance (Koehler's conviction of another murder) and no mitigating circumstances. Regarding the first degree murder of Austin, the jury found two aggravating circumstances (Koehler's conviction of another murder and the victim being less than twelve years' old) and no mitigating circumstances. Accordingly, the jury returned two death sentences. The trial court thereafter imposed two sentences of death, as well as additional terms of incarceration for the remaining offenses, totaling 35 to 70 years of imprisonment.

Koehler, represented by trial counsel, filed a direct appeal in the Pennsylvania Supreme Court, raising fifteen issues. Finding no merit to his

contentions, the Court affirmed Koehler's judgment of sentence.  *Koehler I*. The United States Supreme Court denied Koehler's petition for writ of certiorari on October 2, 2000. *Koehler v. Pennsylvania*, 531 U.S. 829 (2000).

On September 6, 2001, Koehler filed a timely petition for post-conviction relief entitled, "Petition for Habeas Corpus Relief Under Article I, Section 14 of the Pennsylvania Constitution and For Statutory Post–Conviction Relief under the Post Conviction Relief Act," in which he raised nineteen issues, primarily challenging prior counsel's effectiveness.  On June 30, 2009, the PCRA court issued an opinion and order denying collateral relief.   The Pennsylvania Supreme Court affirmed the denial of PCRA relief on January 20, 2012, which led to the litigation of Koehler's habeas petition in the District Court.

Koehler now seeks to appeal the District Court's rejection of four of his habeas claims:

1. Alleged suppression of evidence and presentation of false testimony relating to Kirk Schrader

2. Allegedly deficient jury instructions on the Commonwealth's obligation to prove that Koehler had the intent to kill

3. Alleged prejudice from trial counsel's failure to present family history mitigation evidence in the penalty phase

4. Alleged cumulative prejudice

## **The District Court's rejection of Koehler's proposed appellate claims cannot reasonably be deemed debatable or wrong.**

Under 28 U.S.C. § 2253(c)(2), a court may not issue a certificate of appealability unless "the applicant has made a substantial showing of the denial of a constitutional right." In other words, a certificate of appealability should not issue unless "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Supreme Court in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), explained: "[A] court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Id*. at 1039. However, this "holding should not be misconstrued as directing that a COA always must issue." *Id*. Through AEDPA, Congress intended the courts to apply "differential treatment for those appeals deserving of attention from those that plainly do not;" the "issuance of a COA must not be pro forma or a matter of course." *Id*. at 1040. *United States v. Ruddock*, 82 F. App'x 752, 758 (3d Cir. 2003).

## *Brady* Claim

Koehler first claims that the Commonwealth failed to disclose evidence that Kirk Schrader had entered into a non-prosecution agreement with the Commonwealth that would shield him from prosecution in exchange for his cooperation against Koehler.  He claims that this non-disclosure constituted a violation of the holding of *Brady v. Maryland*, 373 U.S. 83 (1963).  The Pennsylvania Supreme Court rejected this claim.  *Commonwealth v. Koehler*, 36 A.3d 121, 137–38 (Pa. 2012) (*Koehler II*). Upon review, the District Court agreed with the state court's decision.  Koehler submits that this decision was erroneous.

The state court based its decision on a factual finding that "there was no undisclosed agreement [at the time of Koehler's trial] which might have impeached Schrader and no undisclosed exculpatory evidence." *Koehler–II*, 36 A.3d at 137–38 (quotation marks omitted). In doing so, the court noted there was "ample evidence" to support a finding that Schrader believed his testimony at Koehler's trial could subsequently be used against him, and, therefore, he had no reason to fabricate testimony in exchange for favorable treatment. *Id*. at 138. Such "ample evidence" included the testimony of District Attorney McGuinness at the PCRA hearing, as well as the testimony of Schrader himself. *Id*. Each testified that a non-prosecution agreement did not exist at the time of Schrader's testimony at Koehler's trial. In fact, the Pennsylvania Supreme Court acknowledged that the PCRA court

had credited this testimony which established that Schrader believed the non-prosecution agreement had been revoked at the time of Koehler's trial. *Id.*

In light of the evidence recited and relied upon by the Pennsylvania Supreme Court, and in the absence of a contrary showing by Koehler, the District Court concluded that Koehler had not rebutted the state court's factual findings with clear and convincing evidence. See 28 U.S.C. §2254(e)(1). The state court's decision that there was no undisclosed agreement which may have impeached Schrader and no undisclosed exculpatory evidence, was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)-(2).  DCO at 45-47.

The state court's decision did not rest on an unreasonable determination of the facts and the District Court did not err in accepting that determination.  Under these facts and circumstances, it cannot be said that this decision was debatable or wrong.  A certificate of appealability should therefore be denied.

### *Giglio/Napue* **claim**

Koehler also alleges that the Commonwealth violated the holding of *Giglio v. United States*, 405 U.S. 150 (1972) with respect to Schrader's testimony and that the District Court erred in declining to grant relief on this claim.   In *Giglio*, the Supreme Court extended *Brady* to certain impeaching evidence, holding that, "[w]hen the 'reliability of a given witness may well be determinative of guilt or

innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of required *Brady* disclosure]." *Giglio*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

In *Giglio*, the Government's case depended almost entirely on the testimony of a witness whom the Government promised it would not prosecute if he testified. The trial prosecutor had not himself made the agreement and was unaware of it, but the Court charged him with knowledge of the agreement made by his predecessor. The Court held that, because the evidence was relevant to the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury[.]' " *Id*. at 154 (quoting *Napue*, 360 U.S. at 271).

Upon review, the District Court found that the instant case did not present a *Giglio* violation.   DCO at 47-48.  In order to establish such a violation, Koehler must show that: (1) Schrader committed perjury; (2) the prosecution knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) the testimony was material, meaning that there is a reasonable likelihood that the false testimony could have affected the verdict. See, e.g., *Guzman v. Sec'y Dep't of Corr.*, 661 F.3d 602, 613–14 (11th Cir.2011); *Lambert v. Blackwell*, 387 F.3d 210, 242–43 (3d Cir.2004); *Steele v. Beard*, 830 F.Supp.2d 49, 75 (W.D.Pa.2011).

There is no evidence that Schrader committed perjury at Koehler's trial or that the Commonwealth knew or should have known of any alleged perjury. As the Pennsylvania Supreme Court found, "There was ample evidence of record to support the finding that Schrader believed that his testimony at [Koehler's] trial could subsequently be used against him, and, therefore, had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth." *Koehler–II*, 36 A.3d at 138. Again, that "ample evidence" included testimony from both District Attorney McGuinness and Schrader that a non-prosecution agreement did not exist at the time of Schrader's testimony at Koehler's trial. In addition, former District Attorney Fleury testified that he did tell Schrader he was not considered a suspect, but never told him he would not be prosecuted. Trooper Madigan acknowledged that he may have simply inferred the statement regarding non-prosecution from District Attorney Fleury recorded in his report. Further, Koehler failed to demonstrate that "there is any reasonable likelihood that the false testimony could have affected the verdict." As set forth herein, the Commonwealth presented significant evidence independent of Schrader's testimony to prove to the jury that it was Koehler who conspired with, and in fact expressly directed, Curley to kill Regina Clark and Austin. For these reasons, Koehler's *Giglio* claim was denied.

Even if Koehler demonstrated that Schrader's testimony implicated his federal constitutional rights—and he has not—any error would be harmless in light of the other evidence introduced at his trial. As set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the harmless error evaluation requires that, in order to grant habeas relief, a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). See also *Guzman*, 661 F.3d at 622–23 (applying *Brecht* harmless error analysis to a *Giglio* claim); *Rosencrantz v. Lafler*, 568 F.3d 577, 588 (6th Cir. 2009) (same). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quotation marks omitted); *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir.2008). Because the District Court was not in grave doubt that the introduction of Schrader's testimony had a "substantial and injurious effect or influence" on the jury's verdict, any error was harmless under *Brecht*. Thus, Koehler was not entitled to habeas relief on this claim.  DCO at 48-49.

The state court's decision did not rest on an unreasonable determination of the facts surrounding Schrader's testimony and the District Court did not err in accepting that determination.  Under these facts and circumstances, it cannot be

said that this decision was debatable or wrong.  A certificate of appealability

should therefore be denied.

## Jury instruction claims

Koehler next alleges that the trial court gave erroneous instructions that

allowed the jury to convict him of first-degree murder based on an accomplice or

co-conspirator's specific intent to kill, as opposed to his own specific intent.  He

alleges both an underlying trial court due process error and ineffective assistance

of counsel in failing to object.  He submits that the District Court erred in rejecting

both of these claims.

## Due Process claim

In rejecting Koehler's claim that the trial court's instruction deprived him of

due process, the District Court recognized that it "must focus initially on the

specific language challenged." *Francis v. Franklin*, 471 U.S. 307, 315 (1985);

*Smith v. Horn*, 120 F.3d 400, 411 (3d Cir. 1997). The Court must then consider the

challenged language in the context of the jury charge as a whole. *Francis*, 471 U.S.

at 309, 318–19; *Smith*, 120 F.3d at 411. The ultimate question is " 'whether there is

a reasonable likelihood that the jury has applied the challenged instruction in a

way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde v.*

*California*, 494 U.S. 370, 380 (1990)); *Smith v. Horn,* 120 F.3d 400, 411 (3d Cir.

1997). Under *Boyde*, it is not enough that a disputed charge might have been, or could have been, misinterpreted by the jury, or that a single juror or some number less than all of the jurors was confused by the instruction. *Boyde*, 494 U.S. at 378–80. The *Boyde* standard requires the petitioner to demonstrate a reasonable probability that all of the jurors were sufficiently confused by the disputed instruction as to have interpreted the charge in an unconstitutional manner. *Id*. See also *Weeks v. Angelone*, 528 U.S. 225, 238, (2000) (rejecting notion that possibility, rather than reasonable probability, of total jury confusion is sufficient for constitutional error).

Nonetheless, even if a jury instruction is found to violate due process, a district court should grant a new trial only if the error is not harmless. *Neder v. United States*, 527 U.S. 1, 9 (1999) (holding that harmless error analysis applies to jury instructions that violate the principle of *United States v. Gaudin*, 515 U.S. 506, 507, (1995)); *Smith*, 120 F.3d at 417–18 (applying the harmless error standard from *Brecht* to habeas petitioner's claim that trial court improperly instructed the jury that it could convict without finding that the petitioner had specific intent to kill).

Upon review, the District Court found that Koehler's challenge to the specific intent to kill instruction lacked merit. The Court made such a finding based on its reading of the jury charge as a whole. Taken in context, the challenged

accomplice liability charge was clear, as was the trial court's instruction on specific intent. In light of the trial court's instruction distinguishing between the degrees of murder, as well as how accomplice liability and the act of being a co-conspirator play into those degrees, there was no reason to believe that the jurors could or did conclude from it that, if they found that Koehler was an accomplice to a non-intentional homicide, they should convict him of first-degree murder. This is especially true given that after the trial court instructed the jury on causation in criminal homicide as it relates to accomplice liability and liability as a co-conspirator, it moved immediately into a discussion of the intent requirements for the different degrees of murder. Moreover, from a reading of the charge as a whole, it is clear that, in deciding whether Koehler was guilty of conspiracy, the jury had to determine whether he had the specific intent to kill. (Trial Notes of Testimony 4/11/1996 a.m. Part 1 Vol. XXVII 20–21.) The instructions given by the trial court did not permit the jury to convict Koehler of first degree murder absent a finding that he had the specific intent to kill.  As such, the trial court properly instructed the jury on the specific intent to kill and Koehler, therefore, was not denied his right to due process here.  Under these facts and circumstances, it cannot be said that this decision was debatable or wrong.  See DCO at 192-193. A certificate of appealability should therefore be denied.

**Ineffective assistance of counsel claim**

In rejecting Koehler's claim that trial counsel was ineffective in failing to object to the trial court's jury charge, the District Court again turned to the analysis performed by the Pennsylvania Supreme Court. In that decision, the court found that Koehler was not prejudiced "as there is not a reasonable probability that the outcome of the trial could have changed had trial counsel objected to the jury charge." *Koehler–II*, at 156. In doing so, the state court found that the instructions on accomplice liability and criminal conspiracy, as well as those on the elements of first degree murder and specific intent to kill, comported with Pennsylvania law. *Id*. The District Court agreed with that finding. Viewing the instruction as a whole, the jury was clearly instructed on the need to find Koehler himself possessed the specific intent to commit first degree murder. The instructions accurately recited Pennsylvania law. Thus, the Pennsylvania Supreme Court's conclusion that Koehler's claim of ineffective assistance of counsel failed for lack of prejudice was not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). Koehler was not entitled to habeas relief on this claim. DCO at 193. Under these facts and circumstances, it cannot be said that this decision was debatable or wrong. A certificate of appealability should therefore be denied.

**Penalty phase mitigation claim**

Koehler asserts that the District Court erred in concluding that he had failed to demonstrate that he suffered prejudice when trial counsel only called his mother to testify in mitigation on his behalf in the penalty phase of trial.  The District court considered all the evidence produced at trial and at the PCRA evidentiary hearing and rejected the claim on the basis of a lack of prejudice.   The District Court found that the jury heard evidence of Koehler's background, including pertinent information related to his early home life. The information presented at the PCRA hearing did little more than provide further detail as to the unfortunate childhood about which the jury already heard. Further, although the jury was presented with no mental health testimony at trial, such testimony at the PCRA hearing was not compelling. Specifically, mental health expert testimony as to his diagnosis of a personality disorder and ADHD was successfully challenged by the Commonwealth's use of a competing expert opinion. In light of what the jury did hear at trial compared with evidence presented at the PCRA hearing, the District Court concluded that Koehler had not demonstrated a reasonable probability that the result of his sentencing hearing would have been different had counsel presented additional evidence after conducting a more thorough investigation of mitigating circumstances. DCO at 96-97.  Thus, the state court decision was neither contrary to, or an unreasonable application of, any clearly established

federal law. 28 U.S.C. § 2254(d). Habeas relief on this claim was therefore denied.

Under these facts and circumstances, it cannot be said that this decision was

debatable or wrong. No certificate of appealability should issue on this claim.


**Cumulative prejudice claim**

Koehler's final claim is that the District Court erred in declining to find that

the cumulative effect of all the errors ha alleged deprived him of due process.

There is no clearly established federal rule that permits relief for cumulative error.

See *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013) (petitioner failed to

"identify a Supreme Court case that clearly establishes that the admission of

evidence that improperly bolsters a prosecution witness's testimony" denies due

process; "Because no Supreme Court case requires such a conclusion, we reverse

the judgment of the district court") (footnote omitted); *Brown v. Ruane*, 630 F.3d

62, 69 (1st Cir. 2011) ("The Supreme Court has recently emphasized that whether

federal law is clearly established for the purpose of the habeas statute is not simply

a function of the clarity of the particular legal principle relied upon by a petitioner,

but also of the clarity of that principle's application to the facts of the petitioner's

case … courts must be careful not to improperly turn the Court's context-specific

holdings into blanket rules") (footnote, citation, internal quotation marks and brackets omitted).

This Court has held that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir.2008) (quoting *Albrecht v. Horn*, 471 F.3d 435, 468 (3d Cir.2006)). See also *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002) (finding that certain errors, harmless when viewed individually, may be so prejudicial when taken cumulatively as to warrant a new trial) (citing *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir.1980)). Cumulative errors will only be deemed not harmless where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.' " *Fahy*, 516 F.3d at 205 (internal citation omitted); see *Brecht*, 507 U.S. at 637. To demonstrate actual prejudice, Koehler must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986).

Here, the Pennsylvania Supreme Court considered this claim on the merits in its decision affirming the denial of PCRA relief. *Koehler–II*, 36 A.3d at 161. Specifically, the state court concluded that, because it already decided that Koehler's claims individually did not prejudice him, under this claim for relief those claims, when considered in the aggregate, still did not prejudice him. Id. This decision is not contrary to, or an unreasonable determination of, federal law. 28 U.S.C. §2254(d). Koehler has failed to demonstrate any such cumulative prejudicial effect. The District Court found all of Koehler's claims relating to both the guilt phase and the sentencing phase to be meritless. Even considering cumulatively the few instances of harmless error identified by Koehler and recognized by the Court, their overall effect was not so prejudicial to the fairness of the proceedings as to warrant a new trial. See generally *Marshall*, 307 F.3d at 94. Therefore, this claim was denied. Under these facts and circumstances, it cannot be said that this decision was debatable or wrong. DCO at 205. No certificate of appealability should issue on this claim.

**Conclusion**

A certificate of appealability should be denied on all of Koehler's claims.

/s/ Gregory J. Simatic
Deputy Attorney General
Attorney I.D. No. PA 201019
(412) 565-2748
gsimatic@attorneygeneral.gov

Pennsylvania Office of Attorney General
Criminal Law Division
Appeals Section
1251 Waterfront Place, Mezzanine Level
Pittsburgh, PA 15222

Date: February 28, 2025